NORMAN *v.* NORMAN

[No. 19,115.  Filed October 3, 1960.]

*Oscar B. Smith, Jr., Smith & Smith,* of Knox, and *Albert B. Chipman,* of Plymouth, for appellant.

*Alban M. Smith,* of LaPorte, and *Paul Reed,* of Knox, for appellee.

MYERS, J.—This is an action brought by appellant, Elizabeth H. Norman, plaintiff below, for partition of

real estate in Starke and LaPorte Counties in the State of Indiana. She claimed to be the owner of an undivided two-thirds thereof, stating that appellee, Alta Norman, defendant below, was the owner of the remaining undivided one-third.

Appellee filed a cross-complaint in which she alleged that she was the widow and sole heir at law of Aaron Norman, who died the owner in fee simple of said real estate, and that on his death she became the owner of the entire property. She asked to have her title quieted.

By way of a second paragraph of answer to appellee's cross-complaint, appellant claimed title to the undivided two-thirds by virtue of certain deeds which she declared were executed by Aaron and delivered to her during his lifetime, together with a letter from him wherein he stated that the deeds were a gift to appellant subject to his wife's (appellee's) statutory one-third upon his death, and also subject to a life estate to be reserved in him. Appellant asked that her title be quieted. Appellee filed a reply to this second paragraph of answer in general denial, admitting, however, that Aaron Norman had possession of the real estate from the date of the alleged deeds until his death.

The issues being thus formed, a trial by jury was had and a verdict returned in favor of appellee on her cross-complaint against appellant. Appellee moved for judgment on the verdict, and judgment was entered in accordance therewith. Appellant filed her motion for a new trial, which was overruled, and this appeal followed.

Appellant's only assignment of error was that of overruling the motion for a new trial. In that motion it was urged that the court had erred on the grounds that the verdict was not sustained by sufficient evidence; that the verdict was contrary to law; that errors

of law occurred at the trial in that incompetent evidence was permitted to go to the jury; that the trial court erred in refusing to give the jury certain of appellant's tendered instructions.

Appellee contended at the trial that when the deeds were executed by Aaron Norman (1) he was of unsound mind; (2) he was subject to undue influence; and (3) there was an uncompleted gift. Appellant claims that there was no evidence of probative value to prove these contentions, and that there was error at law in the court's refusal to withdraw from the jury these respective issues.

The evidence most favorable to appellee as revealed by the record shows that Alta and Aaron Norman were married in 1918. They lived together as husband and wife until the date of his death, being November 18, 1955. No children were born to them. They resided on and farmed about 235 acres of land in Starke and LaPorte Counties near the town of Hamlet, Indiana, which land is the subject-matter of this lawsuit. Aaron held title to it in his own name prior to and during his marriage. It was not held by them as tenants by the entireties.

Appellant, Elizabeth H. Norman, was Aaron's sister, who lived in Chicago at the time the events took place in this cause. They were members of a family of eight children and had known poverty in their youth. Aaron never went to school beyond the fourth grade. Elizabeth went through grammar school and started high school. Then she took a secretarial course in a Business College in South Bend. From there she took a position as secretary to a Chicago firm and later as private secretary to a mortgage banker, who died in 1934. She remained in his office as the executive in charge of the business,

and was in such capacity at the time of this trial. Apparently she was quite successful as a business woman. She testified that she owned over one hundred acres of land in Indiana, an apartment building and house in Chicago, $6,500 in cash, $2,500 in government bonds, and $50,000 in notes. In 1951 she stated that she was probably worth $160,000, and received income, after taxes, of about $12,000. She and her brother Aaron saw each other and exchanged letters throughout the years. Usually she came down from Chicago to visit him and perhaps stay overnight at his home. She said that Aaron had confidence in her and that they were a "closely knit family."

According to the testimony of his wife, some friends and neighbors, Aaron "began to change," beginning in 1939. He would not go into town by himself on the usual household and farm matters. He began acting suspicious of all people, including friends and neighbors, staying away from them or cursing them if he had occasion to meet them. He was afraid that he was going to be poisoned by gas from small tear-gas fountain pens, which he believed certain persons carried. He went into detail how they could poison him in such fashion. Starting in 1940, he wrote on sheets of paper lists of names or descriptions of people he knew or had done business with who he claimed were trying to poison him. These lists were in his handwriting. After each name he had written a number, varying between one and twelve. At the bottom of each sheet he placed the number of names written down and added the numbers after each name. For example, one sheet summed up as follows: "18 men  38 times"; another was: "18 men  55 times"; another read: "9 men  15 times." A fourth sheet had written on the bottom: "this is the names of the men that use the poison on me." Some of

the men named therein testified at the trial. All denied any attempts at poisoning or harming Aaron in any way.

Alta, his wife, testified that during 1940 he moved out of their bedroom and began sleeping on the davenport. Thereafter he would get up during the night and come into the bedroom where he would curse and threaten her. He often whispered to her, telling her that microphones had been planted in the house and that people were listening to him. He believed that airplanes flying overhead were attempts to gas him.

At length he would not go out into the fields with his tractor unless Alta was with him. He often wore a respirator on his face when working around the farm, although there was no dust or evidence that he had hay fever. This was a plastic disk with a filter inside which fitted over his nose and mouth and was held in place by elastic. Alta stated that he wore it places where he feared he would be shot with gas.

On November 10, 1942, Elizabeth came down from Chicago and stayed overnight at Aaron's house. Elizabeth testified that previously thereto, Aaron had talked to her about getting his affairs settled; that he wanted to give her everything he had, including all his real and personal property except a one-third interest which he wanted to go to his wife at his death; that he wanted to reserve a life estate in the real property for himself; that some time in October, 1942, she had come down and obtained his deeds and abstracts of title to all his property; that she took these back to Chicago with her and sent them to abstracters for title search.

On November 11, 1942, Aaron and Elizabeth drove to Chicago, where they went to the offices of a Chicago law firm which had performed legal services for Elizabeth. One of the lawyers there had prepared a trust agreement concerning all his property. Aaron refused

to sign it. Three warranty deeds were then prepared for the real property here involved. By these deeds Aaron conveyed his fee-simple title to Elizabeth outright without any reservation. A bill of sale was also drawn pertaining to all crops, livestock, farm equipment and tools of which he was possessed. They were purportedly sold to Elizabeth for a consideration of $10. The warranty deeds each recited a consideration of $10 and other valuable consideration. Aaron signed the deeds and bill of sale and handed them over to Elizabeth in the attorney's office.

At the same time these events took place, two letters were dictated by the attorney. One was addressed to Elizabeth from Aaron and reads as follows:

"Chicago, Illinois, November 11, 1942

"Miss Elizabeth H. Norman,
"11 S. LaSalle Street, Room 1917,
"Chicago, Illinois.

"Dear Elizabeth:

"I hand you herewith three Warranty Deeds of even date to all of my farm property in Starke County and Laporte County, Indiana, comprisong approximately 234 acres.

"This is pursuant to many months of consideration by me and it is intended as an outright gift to you. I have been advised by James Deming, an attorney, that under the laws of Indiana, my wife, Alta Norman, will receive one-third of the property conveyed as aforesaid upon my death. It is my desire that my wife do receive one-third of said property in fee upon my death. The intention being that you are to receive two-thirds of all my real estate. I also hand you herewith bill of sale of even date hereof conveying all of the cattle, grains and miscellenous personal property now located on my farm. This is considered the same as the real estate, to wit: an outright gift to you.

"It is my wish that in the event that I die prior to my wife you cause to be transferred to her one-

third of the personal property described in said bill of sale.

> *"Aron Norman*
> "Aaron Norman"

The other letter was addressed to Aaron from Elizabeth and reads as follows:

"Chicago, Illinois, November 11, 1942.

"Mr. Aaron Norman,
"Hamlet, Indiana.

"Dear Aaron:

"I acknowledge receipt of the three warranty deeds of even date to all of your farm property located in Starke County and LaPorte County, Indiana, consisting of 234 acres together with bill of sale conveying all of the cattle, grains and miscellaneous personal property now located on the farm, for which I thank you.

"These deeds will be recorded immediately and upon your death one-third of the real estate described in the above deeds and one-third of the personal property will be conveyed to your wife, Alta Norman, if she survives you; the one-third interest to Alta to be in fee.

"It is our understanding that you are to retain a life interest in said farm during your lifetime, that is to say, that you are to receive and keep all of the income from the farm and farm property and will pay all expenses of the farm during your lifetime.

> *"Elizabeth H. Norman"*

Elizabeth then took possession of all deeds, abstracts of title and other papers, including the original of her letter to Aaron. She put them away and drove Aaron back home. The deeds were placed of record on December 5, 1942.

Alta testified that Aaron said nothing to her about what had happened in Chicago. When he returned she said he made the following statement: "She [Eliza-

beth] shot that poison in me all the way up there."
Alta claimed she never knew anything about this transaction or what transpired in Chicago until after his
death, which occurred on November 18, 1955.

There was much conflicting testimony at the trial of
this cause. This court will not weigh such evidence,
but will support the jury's verdict unless the evidence was of such character that to believe it
would involve an absurd or unreasonable conclusion. *Bailey* v. *Washington Theatre Co.* (1942), 112
Ind. App. 336, 41 N. E. 2d 819.

At the time of trial appellant filed three separate and
several motions to withdraw from the consideration of
the jury issues presented by the appellee, being (1) the
issue of uncompleted gift, (2) the issue of undue influence, and (3) the issue of unsoundness of mind, on the
ground that there was no evidence of probative value
introduced to support those issues. These motions were
overruled, as were subsequent motions for a directed
verdict submitted by appellant. This is claimed as error
and is appellant's basic argument for reversal.

At the outset, we must consider the claims of the two
parties involved therein in regard to the law applicable.
Appellant claims title to an undivided two-thirds
of the real and personal property which belonged
to Aaron by reason of the instruments executed
and delivered on November 11, 1942. It is her contention that such were evidence of an outright gift to her
subject to a life estate in Aaron. There is a complete
failure of the evidence in the record before us that he
received any of the stated considerations or had any
intention to make a bargain and sale. If there was a
valid transaction prior to Aaron's death, two-thirds of
the real estate would remain vested in Elizabeth provided Alta survived. This is so because title vested in

Aaron alone and he could make a conveyance subject to statute. His wife's inchoate interest of one-third could not be extinguished by his actions. See §6-203, Burns' 1953 Repl.

Alta's claim to title was by virtue of the law of descent pursuant to Aaron's death. There being no surviving issue or parents, she asserts that she was entitled to the entire net estate. Section 6-201, Burns' 1953 Repl.

We shall first take up the question as to the sufficiency of the evidence on the issue of uncompleted gift. The use of the term "uncompleted gift" is a misnomer. A gift is a thing transferred; a voluntary transfer of property by one person to another without consideration. 14 I. L. E., Gifts, ch. 1, §2, p. 511. It is an act which has taken place and is complete in itself. For a gift to be incomplete is a negation of terms. There is either a gift or there is not a gift. There is no halfway point between the two. The issue here confronting us is whether or not there was a *valid* gift. Under our law, if there was incompleteness or something left to be done, there was no gift, but only an attempted gift.

Reviewing the record, we find no evidence that the purported gift was made by Aaron when he was in fear of death so as to be a gift *causa mortis*. Furthermore, real estate cannot be made the subject of such a gift as it pertains to personal property only. *Hinton, Admr.* v. *Bryant* (1934), 99 Ind. App. 38, 190 N. E. 554.

A gift *inter vivos* must contain the following elements: (1) The donor must be competent to contract; (2) there must be freedom of will; (3) the gift must be completed with nothing left undone; (4) the property must be delivered by the donor and

accepted by the donee; and (5) the gift must go into immediate and absolute effect. *Zorich* v. *Zorich* (1949), 119 Ind. App. 547, 88 N. E. 2d 694.

It appears that, as to the personal property described in the bill of sale, there was sufficient evidence from the letters set forth above and the testimony of Elizabeth that the jury could have found that the gift was to take effect after Aaron's death. However, such a gift of personal property is invalid. Our courts have stated:

> "An agreement, intention, or promise to make a gift effective in the future is void as being without consideration." *Bulen* v. *Pendleton Banking Co.* (1948), 118 Ind. App. 217, 230, 78 N. E. 2d 449, 455, 456; *Kraus* v. *Kraus, Executor, etc., et al.* (1956), 235 Ind. 325, 132 N. E. 2d 608.

As to the conveyances of real property made by deed, we have seen that in order to be valid gifts, the donor must be competent to contract and there must be freedom of will. Thus, the question of whether Aaron was subject to undue influence or was of unsound mind at the time the transactions took place becomes very pertinent to the outcome of this lawsuit. This is admitted by appellant in her tendered instruction No. 30 which was given by the court and is as follows:

> "It is the law that all persons, except infants and persons of unsound mind, may transfer by gift any interest which he may have in land or personal property, to any person capable of holding the same. So in this case if you find from a preponderance of the evidence that on November 11, 1942, said Aaron Norman *was a person of sound mind*, he had the right to give his property to whomsoever he pleased." (Our emphasis.)

Should the issue of undue influence have been withdrawn from the jury?

Undue influence has been defined as follows:

" 'Any influence, however exercised, which destroys free agency and substitutes the will of another for that of the person in whose name the act brought in judgment is done, is undue or wrongful. 2 Pomeroy, Eq., sec. 951; 27 Am. and Eng. Ency. of Law, 452. As bearing on the question of undue influence, the relationship of parties to each other, the mental condition of the person whose act is in question, and the character of the transaction, should be taken into consideration. If the relation of confidence and trust between the parties to the transaction exists; if the mind of the one nominally acting is weak and susceptible, and if the transaction results beneficially to the person charged, and detrimentally to the person in whose name the act was done, a presumption of undue influence is raised, and the burden is placed on the one claiming the benefit of the transaction to prove that the act was voluntary and no unfairness was used. Indeed, the presence of the relation of confidence and trust alone is generally sufficient to raise a presumption of undue influence; so, also, if the party acting be of weak mind and there is either no consideration, or a very inadequate one, a presumption against its validity arises. 2 Pomeroy's Eq., sec. 947; *Allore* v. *Jewell,* 94 U. S. 506; *Griffith* v. *Godey,* 113 U. S. 89.'

" '. . . Undue influence exists when, through weakness, ignorance, dependence, or implicit reliance of one on the good faith of another, the latter obtains an ascendency which prevents the former from exercising an unbiased judgment . . .' " *Folsom* v. *Buttolph* (1924), 82 Ind. App. 283, 296, 297, 143 N. E. 258, 262.

It is a question of fact for the jury. *Davis, Exr.* v. *Babb* (1921), 190 Ind. 173, 125 N. E. 403; *Workman* v. *Workman* (1943), 113 Ind. App. 245, 46 N. E. 2d 718.

There was evidence of a brother-and-sister relationship between Aaron and Elizabeth which was close and

confidential; that she knew he was mentally weak; that compared to her he was uneducated and without business experience. It is obvious that the result of the transaction was most favorable to her. Under these circumstances it may be assumed, and the jury could have so found, that Aaron was subjected to undue influence on the part of his sister. *Westphal* v. *Heckman* (1916), 185 Ind. 88, 113 N. E. 299.

As to the question of whether the trial court committed error in refusing to withdraw the issue of unsoundness of mind, we find there was sufficient evidence of probative nature to justify this issue being preserved for the jury. At least nine witnesses who knew Aaron testified that in their opinion he was of unsound mind. There was even testimony to the effect that Elizabeth, herself, was of that opinion. In the fall of 1943, and for several years thereafter, Elizabeth hired and paid for the services of three different private detectives from Chicago who were sent down to Aaron's farm for a week or ten days at a time during the spring and fall. Two of them testified that they went there to act as bodyguards and to accompany him into town during harvesting and planting time. One stated that Elizabeth told him in substance that her brother was not in very good shape mentally. The other thought he was of unsound mind and stated: "I was told so by his sister."

A psychiatrist from Michigan City, Indiana, in answer to a hypothetical question as to Aaron's sanity, testified that he was of the opinion that Aaron had been of unsound mind from 1938 to the time of his death in 1955. He diagnosed the condition as "paranoid schizophrenia." It was his opinion that this condition would not impair Aaron's ability to do ordinary farm work, but it could affect his mental faculties to conduct

an unusual transaction. He testified further that if Aaron trusted a person it would have been easy for him to have acted in concert with that person.

Appellant's own medical witness testified that while he believed Aaron to have been of sound mind at the time, he did not think it normal for Aaron to have been afraid some one was going to poison him. He further said that if Aaron had written down the names of about forty-seven people who he thought were poisoning him with gas, and that he believed they had done so well over one hundred times, he certainly was not of sound mind if that existed.

In the case of *Raymond et al.* v. *Wathen et al.* (1895), 142 Ind. 367, 374, 41 N. E. 815, 817, the Supreme Court defined unsoundness of mind as follows:

"It has been recognized by the decisions of this court that where there is an essential privation of the reasoning faculties of the person in question, or an incapacity of understanding, and acting with discretion in the ordinary affairs of life, he is, in that event, a person of unsound mind.

"And where it is shown that such mental incapacity existed at the time of the execution of the deed or contract controverted, it is sufficient to avoid the same. This seems to be the true test, and correct rule, adhered to by the decisions of this court."

We believe that within the confines of this definition, which seems to be the true test and correct rule, the jury could have found sufficient evidence that Aaron was of unsound mind at the time the transactions took place.

Appellant predicates error on the overruling by the trial court of specifications 3 (b), 3 (d), 3 (e) and 3 (f) of her motion for a new trial. These specifications

relate to appellee's question to several lay witnesses as to whether in their opinion Aaron was of sound mind. Appellant contends that the proper groundwork was not laid for this question. She argues that before a nonexpert witness can give an opinion as to the soundness or unsoundness of mind of a person, such witness must relate facts as to conversations, and observations as to conduct and appearance, and then, based on the facts as detailed to the jury, submit an opinion.

Upon reviewing the testimony of these witnesses, we find it only related to certain facts as to Aaron's conduct, appearance and conversation which the witness had personally seen and heard at specific times. Each one then stated that his opinion was based upon these observations.

In the case of *Stumph et al.* v. *Miller* (1895), 142 Ind. 442, 446, 41 N. E. 812, 813, the Supreme Court made the following statement:

"It has frequently been held that when a witness gives the facts upon which he bases his opinion, as to the condition of the mind or body of a person, the opinion itself may also be given, provided the facts show that he is acquainted with the person, has had opportunity to observe, and has observed him. It may be that the witness is unable to place before the court all the facts upon which he bases his opinion, but if he shows acquaintance with the person, and opportunity for observation, and that he has observed, that will be sufficient upon which to base an opinion."

We find there was no error in permitting these nonexpert witnesses to so testify.

Appellant further claims that the form of the question put to these witnesses was improper. To illustrate: A witness was asked as follows: "From your observa-

tion of him while you were there, Mr. Berry, from what you have told us, do you have an opinion as to whether he was of sound or unsound mind?" It is contended that the opinion admitted in evidence was based on matters not testified to and not given to the trier of the facts; that there should have been embodied in the question this phrase: "As you have testified to the court and jury."

We have carefully examined each question objected to as to form in particular, and find that each one as a composite question was substantially as follows: "From your observations of Mr. Norman, and from what you saw him do, from his actions toward you, and the conversations you had with him, do you have an opinion as to whether or not he was of sound or unsound mind?"

We think this type of question sufficiently referred to the witness' previous testimony of facts detailed to the court and jury, and did not permit the jury to speculate and guess on what the opinions of the witnesses were based.

It would have been a different matter if a witness had merely testified that he had known, seen and visited with Aaron over a period of time, without specifying or detailing to the jury how he had known him, what he had seen, or what took place during those visits. Under such circumstances, it would have been improper to have permitted a nonexpert witness to state an opinion as to mental condition. *Olson* v. *Olson* (1951), 242 Iowa 192, 46 N. W. 2d 1, 40 A. L. R. 2d 1.

Appellant next contends that error was committed upon the refusal of the trial court to give certain tendered instructions.

Tendered instruction No. 2 of appellant would have informed the jury in substance that if it found that

Aaron signed, acknowledged and delivered the deeds to Elizabeth, legal title to the realty passed to her. While this may be true under circumstances other than those in this case, if given it would have ignored the evidence of unsoundness of mind and undue influence herein presented.

Tendered instruction No. 7 in substance states that Aaron could make a valid deed in spite of advanced age and infirmity. There is nothing in the record specifically stating Aaron's age. From testimony given by Elizabeth, it could have been inferred that he was in his late fifties. There was no evidence that Aaron was advanced in years or infirm. Thus, this tendered instruction was outside the evidence and the issues of this cause and properly refused.

Tendered instruction No. 9 in substance attempts to set forth the law pertaining to a wife's inchoate interest in her husband's real estate and the legal effect of joinder or nonjoinder of the wife in a deed. Again, this instruction ignores all the evidence on the question of whether Aaron was competent at the time to make the deeds, and so was properly refused.

Tendered instruction No. 35 would have told the jury that the phrase "of unsound mind" includes idiots, noncompos mentis, lunatics and distracted persons. This is based upon a statutory definition concerning certain words and how they are to be construed in an Act of the General Assembly concerning proceedings in civil cases. Section 2-4701, Burns' 1946 Repl. (3rd paragraph). However, the trial court gave appellant's instruction No. 6 in which the jury was fully instructed as to the mental capacity of a person to make a deed. This instruction entirely covered the

issue. We cannot see how appellant was harmed by the refusal to give tendered instruction No. 35.

We find the trial court committed no error.

Judgment affirmed.

Ax, P. J., and Ryan, J., concur.

Cooper, J., concurs in the result.

NOTE.—Reported in 169 N. E. 2d 414.