YEAGER & SULLIVAN, INC. AND CHARLES L. YEAGER *v.* LYNN AND LUCILE O'NEILL.

[No. 3-873A100. Filed March 26, 1975. Rehearing denied May 27, 1975. Transfer denied December 5, 1975.]

*James T. Robison, Robison, Robison & Miller,* of Frankfort, *Phil Goddard,* of Indianapolis, for appellants.

*Frank E. Tolbert, George Wildman, Miller, Tolbert, Hirschauer & Wildman,* of Logansport, for appellees.

HOFFMAN, J.—On August 23, 1972, plaintiffs-appellees Lynn O'Neill and Lucile O'Neill (O'Neills) filed an amended supplemental complaint against defendants-appellants Yeager & Sullivan, Inc. and Charles L. Yeager (Yeager) wherein they alleged, *inter alia,* that Yeager maintained a hog feedlot upon property adjacent to their own and that the particular condition of such operation constituted a nuisance. Trial to the court was commenced on November 21, 1972, and on December 12, 1972, judgment was entered in favor of the O'Neills. Therein, the trial court ordered that the nuisance created by Yeager be immediately abated; that Yeager be enjoined from any further use of the property in question for the purpose of operating "a hog raising business" until such time as certain of the conditions giving rise to the nuisance are abated; and that the O'Neills recover damages in the amount of $3,225, together with their costs. Defendants-appellants' motion to correct errors was subsequently overruled and the present appeal was perfected.

An examination of the record reveals that on April 1, 1969, Yeager commenced a hog feeding operation upon property which it leased from the State in Cass County, Indiana. Thereafter, the Yeager enterprise maintained an inventory of from 2,500 to 3,000 hogs except for two periods of at least thirty days in duration during 1969 and 1970 when the entire premises were depopulated by the Federal Government.

Approximately thirty to sixty days following the commencement of the Yeager operation, the O'Neills, who reside on an adjacent farm to the south, became aware of a pungent aroma eminating from the hog feedlot. The odor, which varied in intensity throughout the year, was particularly foul and obnoxious during the summer months. Atmospheric conditions together with the magnitude of the aroma at such time

necessitated that the O'Neills maintain their residence in a sealed condition; and on several occasions during the years 1970, 1971 and 1972, they were obliged to go elsewhere overnight. Under direct examination, Mrs. Lucile O'Neill testified that "the odor was just so pungent that you just couldn't get your breath." She further stated that, "[m]any times we went down town because it just seemed like all the food tasted like it when I put it on the table."

The O'Neill residence which is situated approximately 1,000 feet from the buildings occupied by Yeager was, in addition to the distinctive bouquet referred to above, beset by a multitude of flies and rats following the commencement of the hog feeding enterprise. Although the O'Neills had not previously been completely free of flies, testimony by Mr. Lynn O'Neill indicated that they were more abundant during the two years preceding the trial herein. Under direct examination, Lucile O'Neill testified that "[t]he flies were thick and in our garage you couldn't hardly get in the car." While the O'Neills "had some rats" during a period when they had grain and maintained livestock, "the rats pretty well left" when the O'Neills dispensed with the keeping of livestock in the 1950s. After the Yeager operation began, however, the rats returned and the O'Neills employed the services of pest exterminators in addition to distributing rat poison and food items with "electric taste."

During the years 1969, 1970, 1971 and 1972, Mr. O'Neill, on occasion, drove past the Yeager operation and at four times beginning in 1971 proceeded onto the premises. He observed a greater accumulation of filth and animal waste material during 1971 and 1972 than that which he had noticed in 1969. Mr. O'Neill also testified that a pile of waste material approximately forty to forty-eight inches high was situated near a door of one of the buildings, that it remained throughout the entire summer of 1972, and that it was not removed until the month of November, 1972. Furthermore, rain during the summer of 1972 had washed an accumulation

of solid waste into drainage ditches and onto a nearby road. Mr. O'Neill stated that "the ditch that extended from the southerly most building draining off onto the road, stood full and is presently full of liquid waste material." In one of the buildings, "possibly the area of twenty by twenty five or thirty feet square, * * * an accumulation of three to five inches of pure animal waste" was observed. To the north of one of the feeding lots, a pit, "possibly eighteen to twenty feet across" contained liquid animal waste. And, ditches on either side of a driveway contained "an accumulation of two to three four inches of liquid animal waste."

Richard Leffert, a policeman for the City of Logansport, Indiana, was asked by Mr. O'Neill to photograph the feedlot operation. He testified that during his visit to the feedlot on September 25, 1971, he observed three dead hogs, "a lot of soggy manure", a "[v]ery strong unpleasant odor", and "[p]lenty of flies." Bernard Leavitt, a health officer, inspected the Yeager operation on September 16, 1971, and September 21 or 23, 1971. He observed many flies and "a lot of water run-off and manure" and concluded that the operation was "unclean."

The first issue to be considered is whether the judgment of the trial court in favor of plaintiffs-appellees O'Neills is supported by sufficient evidence.

In determining the sufficiency of evidence this court, on review, may not weigh the evidence nor resolve questions regarding the credibility of witnesses; rather it is confined in its survey to a consideration of only that evidence and reasonable inferences therefrom which support the judgment of the trial court. *In Re Estate of Barnett* (1974), 159 Ind. App. 491, 307 N.E.2d 490, 41 Ind. Dec. 87; *Glidden* v. *Nasby* (1970), 147 Ind. App. 546, 262 N.E.2d 548; *Butler* v. *Forker, Bd. of Comm.* (1966), 139 Ind. App. 602, 221 N.E.2d 570. If, from that perspective, there is evidence of probative value to support the judgment of the trial court, it is the duty of this court to affirm. *Indiana*

*& Michigan Electric Company* v. *Schnuck* (1973), 260 Ind. 632, 298 N.E.2d 436.

It has been stated that the term "nuisance" is incapable of any precise definition which could be applied in every case; for it "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion." Prosser, Torts, § 87, at 573 (4th Ed. 1971). IC 1971, 34-1-52-1 (Burns Code Ed.), provides that:

> "Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action." See: *Kissel* v. *Lewis* (1901), 156 Ind. 233, 59 N.E. 478; *Haggart et al.* v. *Stehlin et al.* (1893), 137 Ind. 43, 35 N.E. 997, 22 L.R.A. 577; *Hedrick* v. *Tubbs* (1950), 120 Ind. App. 326, 92 N.E.2d 561; *Zeppenfeld* v. *Franklin Motor Service Co.* (1922), 77 Ind. App. 687, 134 N.E. 487; *Acme Fertilizer Co.* v. *State* (1905), 34 Ind. App. 346, 72 N.E. 1037, 107 Am. St. Rep. 190; *Shroyer* v. *Campbell* (1903), 31 Ind. App. 83, 67 N.E. 193.

Largely on the basis of the nature of the interests invaded or rights infringed, nuisances have been classified as either public, private, or a combination of the two. *The Ohio and Mississippi Railway Company* v. *Simon* (1872), 40 Ind. 278; 58 Am. Jur. 2d, *Nuisances,* § 6, at 559-560; 66 C.J.S., *Nuisances,* § 2, at 730-733. Where, as in the present case, the subject of the complaint relates to an interference with the use and enjoyment of land by a limited number of individuals, or where such interference is peculiar to an individual, the character of the nuisance alleged is regarded as private. *Zeppenfeld* v. *Franklin Motor Service Co., supra; Kissel* v. *Lewis, supra.* See: *Ott* v. *Johnson* (1974), 262 Ind. 548, 319 N.E.2d 622, 624. "The essence of a private nuisance is the fact that one party is using his property to the detriment of the use and enjoyment of the property of another." *Stover* v. *Fechtman* (1966), 140 Ind. App. 62, at 67, 222 N.E.2d 281, 9 Ind. Dec. 691, at 695.

In *Meeks* v. *Wood* (1918), 66 Ind. App. 594, at 597-598, 118 N.E. 591, at 592, it is stated:

"The law is well understood that every man has the exclusive dominion and right to the free enjoyment of his own property to use it as he pleases, and that his neighbor enjoys the same rights and privileges with his property; consequently it is the duty of each to so use his own as not to injure that of the other. This duty, however, must be taken with some qualifications, for as it has been held: 'In the nature of things and of society, it is not reasonable that every annoyance should constitute an injury such as the law will remedy or prevent. One may therefore make a reasonable use of his right, though it may create some annoyance or inconvenience to his neightbor. But even in such case, an annoyance lawful in itself may become unlawful when done maliciously. * * * According to our settled notions and habits, there are convenient places—one for the home, one for the factory; but, as often happens, the two must be so near each other as to cause some inconvenience. The law cannot take notice of such inconvenience, if slight or reasonable, all things considered, but applies the common-sense doctrine that the parties must give and take, live and let live; for here extreme rights are not enforceable rights—at any rate, not by injunction.' *Powell* v. *Bentley, etc., Furniture Co.* (1891), 34 W. Va. 804, 809, 12 S.E. 1085, 1087, 12 L.R.A. 54, 55.

"There is another element to be taken into consideration in determining what shall constitute a nuisance, and that is the nature and characteristics of the person claimed to have been annoyed, as well as the nature of the instrumentality causing the annoyance. As was said in a well-considered case: 'In all such cases, the question is, whether the nuisance complained of, will or does produce such a condition of things as, in the judgment of reasonable men, is naturally productive of actual physical discomfort to persons of *ordinary sensibilities,* and of ordinary tastes and habits, and as, in view of the circumstances of the case, is unreasonable and in derogation of the rights of the complainant.' (Our italics.) *Dittman* v. *Repp* (1878), 50 Md. 516, 33 Am.Rep. 325; *Wade* v. *Miller* (1905), 188 Mass. 6, 73 N.E. 849, 69 L.R.A. 820; *Rose* v. *Butler* (1868), 19 N.J. Eq. 294, 97 Am. Dec. 654." (Emphasis are those of the Appellate Court.)

Further, in 4 Restatement, Torts, § 822, at 231, Comment (j), (1939), it is stated:

"Not every substantial non-trespassory invasion of a person's interest in the use and enjoyment of land is actionable, even where such person is the owner of the land in fee simple absolute and another's conduct is the sole and direct cause of the invasion. Life in organized society, and especially in populous communities, involves an unavoidable clash of individual interests. Practically all human activities, unless carried on in a wilderness, interfere to some extent with others or involve some risk of interference, and these interferences range from mere trifling annoyances to serious harms. It is an obvious truth that each individual in a community must put up with a certain amount of annoyance, inconvenience and interference, and must take a certain amount of risk in order that all may get on together. The very existence of organized society depends upon the principle of 'give and take, live and let live,' and therefore the law of torts does not attempt to impose liability or shift the loss in every case where one person's conduct has some detrimental effect on another. Liability is imposed only in those cases where the harm or risk to one is greater than he ought to be required to bear under the circumstances, at least without compensation. * * *."

Not infrequently the keeping of animals, particularly hogs, has fostered litigation based upon a claim that the defendant's enterprise generated intolerable odors while giving rise to an overabundance of rodents and insects.

See *e.g.:*

*The Ohio and Mississippi Railway Company* v. *Simon, supra; Monroe City* v. *Arnold* (1969), 22 Utah 2d 291, 452 P.2d 321; *Pendoley* v. *Ferreira* (1963), 345 Mass. 309, 187 N.E.2d 142, 2 A.L.R.3d 924; *Evers* v. *Thomas* (1962), 273 Ala. 159, 137 So.2d 39; *Wade* v. *Campbell* (1962), 200 Cal.App. 2d 54, 19 Cal.Rptr. 173, 92 A.L.R. 2d 966; *Tollefson* v. *Mitchell* (1946), 25 Wash. 2d 476, 171 P.2d 245; *Trowbridge* v. *Lansing* (1927), 237 Mich. 402, 212 N.W. 73, 50 A.L.R. 1014; *Ohio Stock Food Co.* v. *Gintling* (1926), 22 Ohio App. 82, 153 N.E. 341; *Johnson* v. *V.D. Reduction Co.* (1917), 175 Cal. 63, 164 P. 1119, 1917E L.R.A. 1007; *Phillips* v. *Elizabethtown Butter and Cheese Factory* (1894), 15 Ky. L.R. 574 (abstract) ; *Smiths'* v. *McConathy* (1848), 11 Mo. 517; *Reg.* v. *Wigg* (1705), 2 Ld. Raym. 1163, 92 Eng. Reprint 269; *Aldred's Case* (1610), 9 Coke, 57b, 77 Eng. Reprint 816.

See also:

Anno., 2 A.L.R.3d 931 (1965) ; 4 Am.Jur. 2d, *Animals,* § 65, at 313.

As set forth in 3 Blackstone's Commentaries, at 217, the learned writer noted that "if a person keeps his hogs, or other noisome animals, so near the house of another, that the stench of them incommodes him and makes the air unwholesome, this is an injurious nuisance, as it tends to deprive him of the use and benefit of his house." (Footnotes omitted.) Blackstone quotes Lord Mansfield as having said that " 'it is not necessary that the smell should be unwholesome; it is enough if it renders the enjoyment of life and property uncomfortable.' (1 Burr., 337)." 3 Blackstone's Commentaries, at 217, footnote (2). 66 C.J.S., *Nuisances,* § 23 (d), at 778-779. While the keeping of hogs, being a lawful enterprise, cannot be characterized as an absolute nuisance or a nuisance, *per se,* see: *Meinecke* v. *Stallsworth* (Mo.App. 1972), 483 S.W.2d 633; 66 C.J.S., *Nuisances,* § 33, at 787-788; such an activity can become a nuisance *per accidens* by reason of the manner in which the hogs are kept, the locality or both. *Bower* v. *Hog Builders, Inc.* (Mo. 1970), 461 S.W. 2d 784. A lawful business may be conducted in such a way as to constitute a nuisance. *Muehlman, et ux.* v. *Kielman, et ux.* (1971), 257 Ind. 100, 272 N.E.2d 591; *Griffin* v. *Hubbell* (1937), 212 Ind. 684, 11 N.E.2d 136; *Owen et al.* v. *Phillips et al.* (1881), 73 Ind. 284; *Cox* v. *Schlachter* (1970), 147 Ind. App. 530, 262 N.E.2d 550 (transfer denied) ; *Lake Shore, etc., R. Co.* v. *Chicago, etc., R.Co.* (1910), 48 Ind. App. 584, 92 N.E. 989 (transfer denied) ; *Pritchett* v. *Board, etc.* (1908), 42 Ind. App. 3, 85 N.E. 32. And, it is for the trier of fact to determine whether that which is not in itself a nuisance is a nuisance in fact. 66 C.J.S., *Nuisances,* § 153, at 960.

The trial court herein found:

"1. That defendants, Yeager & Sullivan, Inc., and Charles L. Yeager, have, since April 1, 1969, operated and do operate a hog feeding business on real estate in Clinton Township, Cass County, Indiana, adjoining real estate owned by plaintiffs herein.

"2. That defendants, and each of them, have so operated the business as to allow excrement and other waste materials to pile up.

"3. That defendants, and each of them, have failed to operate the business so as to eliminate the breeding and accumulation of excessive numbers of rats and flies.

"4. That defendants, and each of them, have operated the business so as to create odors offensive to the senses and which are possibly injurious to the health of plaintiffs and which obstruct the free use of the property of plaintiffs by them.

"5. That as a result thereof defendants, and each of them, have created a nuisance as defined by the statutes of the State of Indiana, being Burns Statutes Section 2-505, which nuisance has existed since May 1, 1969."

Appellants specifically challenge Findings Nos. 2, 3 and 4. Finding No. 2 is amply supported by the evidence. As noted above, Mr. O'Neill testified that "there was a pile of waste material about forty to forty-eight inches high piled against the door that remained there the entire summer of 1972 and was not removed until the fourteenth day of November of 1972." He also stated that one of appellants' buildings contained "an accumulation of three to five inches of pure animal waste", and further indicated that a drainage ditch "stood full and is presently full of liquid waste material." Mr. O'Neill noted a run-off of solid waste material into drainage ditches and onto a road. Bernard Leavitt testified as to the existence of "a lot of water run-off and manure." Two photographs introduced into evidence as Plaintiff's Exhibits Nos. 1 and 2 were described by Richard Leffert as depicting a pool which "had a stagnation on the water and an offensive odor coming off of it and it was green in color." Other photographs depicted "[b]arns two and three and a lot of soggy manure" (Plaintiff's Exhibit No. 5) ; and "piles of manure in front of the door and also the run-off" (Plaintiff's Exhibit No. 11).

As for Finding No. 3, the O'Neills testified that there was a marked increase in the number of rats and flies after appellants' operation had been commenced. Richard Leffert and

Bernard Leavitt both described the presence of considerable quantities of flies on the premises occupied by the feedlot. From such testimony, together with other evidence previously set forth, the trial court could reasonably infer "[t]hat defendants * * * have failed to operate the business so as to eliminate the breeding and accumulation of excessive numbers of rats and flies."

In regard to Finding No. 4, evidence was presented which demonstrated both the pervasiveness and intensity of the odor and its effect upon the living conditions of the O'Neills. During the summer months, appellees were forced to keep the doors and windows of their residence closed. They were not able "to set in the yard or on the front porch in the year of 1972 or 71 or 70 by reason of this thick-heavy smell of animal waste." Prior to the installation of the Yeager operation, Mrs. O'Neill would entertain "possibly three times a year." Subsequently, she has not entertained any of her social groups at her home; and with one exception, the O'Neills have not "had company" since 1969. During August and September of 1970, appellees went elsewhere to eat because of the nauseating effect of the odor. The foregoing evidence supports the finding that "defendants * * * have operated the business so as to create odors offensive to the senses * * * and which obstruct the free use of the property of plaintiffs by them."

Such portion of Finding No. 4 which states that the odors alone "are possibly injurious to the health of plaintiffs", is not supported by any direct evidence or inferences to be drawn from the body of evidence relating to odors. However, it must be pointed out that by the very definition to be found in IC 1971, 34-1-52-1, *supra,* a nuisance may be shown to exist in the absence of any injury to health if found to be "indecedent or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property." See: *Radican* v. *Buckley* (1894), 138 Ind. 582, 38 N.E. 53; *Town of Mount Pleasant* v. *Van Tassell* (1957),

7 Misc.2d 643, 166 N.Y.S.2d 458, aff'd 6 App.Div.2d 880, 177 N.Y.S.2d 1010; *Combs* v. *Crawford* (1935), 258 Ky. 405, 80 S.W.2d 46. And, it must be concluded, therefore, that such an erroneous finding is of no moment where other findings, in themselves supportive of a conclusion, are based upon sufficient evidence of probative value.

Appellants' right to engage in a livestock business is beyond question. Furthermore, in any open livestock operation, it is to be expected that granaries and feed bins will attract a certain amount of rodents, that excrement will collect, that insects will congregate thereabouts, and that distinctive odors will be released into the atmosphere; yet, carried to excess, these conditions can become unreasonable and, indeed, intolerable to persons of ordinary sensibilities.

In *Davoust* v. *Mitchell* (1970), 146 Ind. App. 536, at 542, 257 N.E.2d 332, at 336, it is stated:

> "This court has heretofore said that the trial court could consider the ordinary affairs in the lives of men and women and although this court cannot and does not weigh the evidence, we are of the opinion that in deciding whether the evidence is sufficient to sustain the judgment, that we, too, may consider things that happen in the ordinary affairs of life and men."

Upon a consideration of the evidence adduced at trial, together with all reasonable inferences to be drawn therefrom, we must conclude that the decision of the trial court is supported by sufficient evidence.

The next issue to be considered is whether the trial court erred in overruling defendants-appellants' motion to dismiss the complaint at the close of plaintiffs-appellees' case-in-chief. In making their motion appellants asserted that the O'Neills complaint alleged a decrease in the *market value* of their property as a result of the conditions existent on the Yeager premises, while the O'Neills presented evidence relating only to a decrease in the *rental value* of their property. Appellants also note that the trial court, in its judgment, awarded dam-

ages based upon a decrease in the rental value of plaintiffs' property.

Plaintiffs' witness, Fred Smith, a realtor, testified, on direct examination, as to a decrease in the rental value of plaintiffs' property. Such testimony was not objected to upon the ground that it was not within the issues raised by the pleadings. Subsequently, defendants proceeded to cross-examine the witness in regard to a decrease in rental value.

Ind. Rules of Procedure, Trial Rule 15(B), provides that:

> "*When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.* Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment, but *failure so to amend does not affect the result of the trial of these issues.* If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The courts may grant a continuance to enable the objecting party to meet such evidence." (Emphasis supplied.)

Further, in 2 Harvey, Ind. Prac. — Rules of Civ Proc., Civil Code Study Comm., Comments, at 122, it is stated:

> "The new rule provides that pleadings are deemed to be amended to conform to issues tried either by express or implied consent of the parties. Motion to amend a pleading to conform may be made at any time, including after judgment has been rendered. A party objecting to an amendment must show that the granting of such would prejudice him in maintaining his action or defense upon the merits. The rule substantially is in harmony with prior Indiana practice, but will allow, for the first time, automatic amendment of pleadings where parties consent to the trial of the issues involving the amendment. The rule will permit amendment of pleadings after judgment, heretofore not allowed."

In the case at bar, the new issue—a theory as to damages based upon fair rental value, was unequivocally clear by the evidence being submitted; and must, therefore, be deemed to have extended fair notice to appellants that a new issue was to be considered by the trial court. See: *Aldon Builders, Inc.* v. *Kurland* (1972), 152 Ind. App. 570, 284 N.E.2d 826; *Hacker* v. *Rev. Bd.* (1971), 149 Ind. App. 223, 271 N.E.2d 191. Appellants did not object or request a continuance; see: *Ayr-Way Stores, Inc.* v. *Chitwood* (1973), 261 Ind. 86, 300 N.E.2d 335, and proceeded to cross-examine witness Smith in regard to the evidence of fair rental value which had been introduced during direct examination. Where appellants acquiesced in the introduction of the new issue, the question must be regarded as having been tried by implied consent; and will be treated as if it had been raised in the pleadings. *General Outdoor Adv.* v. *LaSalle Rlty.* (1966), 141 Ind. App. 247, 218 N.E.2d 141 (transfer denied).

Appellants next contend that the trial court's finding as to the amount of damages is contrary to the evidence. The question in fact presented by appellants' argument in this regard is whether such finding is supported by sufficient evidence.

It is asserted that the only evidence adduced at trial concerning damages consisted of the testimony of plaintiffs' witness Smith. Appellants are aware that this court will not weigh the evidence nor determine the credibility of witnesses; however, they point out that despite the well-established rule, this court is not always required to sustain a finding if the evidence to support it "is of such a character that to believe it would involve an absurd or unreasonable conclusion." *Bailey* v. *Washington Theatre Co.* (1942), 112 Ind. App. 336, at 343, 41 N.E.2d 819, at 821 (transfer denied); *Isler* v. *Bland* (1889), 117 Ind. 457, 20 N.E. 303; *Norman* v. *Norman* (1960), 131 Ind. App. 67, 169 N.E.2d 414.

Under direct examination, Smith testified that excluding any consideration of odor, flies or rats, the monthly rental for

a house comparable to that of the O'Neills "should be around one hundred and fifty dollars." After taking account of the odor, Smith testified that the rental value of the property "would be approximately half that." Under cross-examination by the defense, Smith was asked, "How many days would it take for the aroma to come down from the hog operation to cause you to cut the rental value of this house from one hundred and fifty dollars to seventy five dollars a month?" Smith replied, "I would say one day a week."

Appellants base their contention that the testimony of Smith could not be believed upon the allegation that the witness vacillated between conclusions that the existence of odor one day per year and one day per week would reduce rental value by the same amount.

Upon a careful examination of the relevant portions of the record, we can only conclude that momentary vascillations which occurred within the decidedly hostile environment of cross-examination were to be considered only by the trier of fact in determining the witness' credibility; and not by this court on review.

The next issue to be considered is whether the amount of damages awarded by the trial court, $3,225, is excessive.

In *Davoust* v. *Mitchell, supra,* at 543 of 146 Ind. App., at 336 of 257 N.E.2d, it is stated that, "[t]he measure of damages in a nuisance case is the injury to the use of the property, the depreciation in rental value." See: *Cox* v. *Schlachter, supra; Cleveland, etc., R. Co.* v. *King* (1900), 23 Ind. App. 573, 55 N.E. 875. Reversal for excessive damages can only be had where it appears at once that the award was so outrageous as to lead to the conclusion that the trier of fact must have been moved by prejudice, passion, partiality or corruption. *Penn Central Transportation Company* v. *Wilson* (1973), 155 Ind. App. 328, 292 N.E. 2d 827 (transfer denied); *Barbee* v. *McKay* (1968), 143 Ind. App. 205, 238 N.E.2d 690 (transfer denied); *Bassemier* v. *Sartore* (1964), 137 Ind. App. 139, 201 N.E.2d 285 (transfer

denied). The evidence most favorable to appellees indicates that the Yeager operation was commenced on April 1, 1969; that the odor became noticeable at least thirty days thereafter; that the conditions complained of continued to the time of trial which took place on November 21 and 22, 1972—a period of more than 43 months; and that the decrease in rental value as a result of the odor was $75 per month. Such evidence adequately supports an award of $3,225 in damages; and it must be concluded that the amount is not excessive.

The final issue to be considered is concerned with appellants' contention that the trial court viewed the premises occupied by the feedlot operation and, in so doing, abused its discretion.

The record discloses that on November 16, 1972, plaintiffs-appellees filed a motion in the Fulton Circuit Court to view the premises involved in this cause. Attached thereto was a certification specifying that copies of the motion had, on the same date, been served upon defendants' counsel by placing them in the mail. The record also contains an affidavit subscribed by defendants' attorney, James T. Robison, which, among other things, stated:

"2. On or about the 15th day of November, 1972, affiant received a letter through the U.S. Mail from one of the plaintiffs setting out the Judge of [the] Court desired to inspect the premises prior to trial and further, a time certain had been agreed upon by an attorney for the Plaintiffs and the Court. All this had been done without the knowledge or agreement of the defendants or any of defendants' attorneys. (See Exhibit B).

"3. On the 15th day of November, 1972, affiant phoned the Court concerning the viewing of the premises prior to trial and expressed to the Court affiant's objections and affiant confirmed the phone conversation with a letter to the Court. (See Exhibit C)."

The letter referred to in the above quoted affidavit as "Exhibit B" indicated that the court had desired to view the premises and that the time suggested for such viewing was "the morning of November 18 at 10:00 o'clock * * *." The letter, which was signed by Lynn O'Neill, further stated:

"I am advised the Judge will be at my office in Logansport prior to proceedings [sic] to the cite, [sic] and while I assure you that I will say nothing before the Court with reference to this issue except to point out the locations, I would much prefer that one of you gentlemen be present at the time of this observation."

As the affidavit of attorney James T. Robison relates, "[t]he Court's official record does not indicate the Court viewed the premises if, in fact, the Court did view the premises." The record on appeal reveals that plaintiffs' motion to view the premises was granted. However, appellants point out that at the time of the filing of their motion to correct errors on February 9, 1973, "there was no entry or ruling on the motion to view the premises as late as December 12, 1972." (Appellants' brief, p. 21) It is asserted that the viewing of the premises, if there was in fact a viewing, was conducted in an irregular manner to the prejudice of appellants and that the official court docket must contain all motions and actions by the trial court.

We agree that the trial court docket should contain timely entries of action taken; however, we conclude that appellants have not demonstrated that the failure to do so or the supposed view was so much to their prejudice as to warrant reversal.

The affidavit referred to hereinabove indicates that appellants' counsel were aware that a view might be had by the court well in advance of the time proposed. They indicate that objections were voiced; yet, they do not claim to have been present at the date and time specified in Mr. O'Neill's letter in order that they might insure against or later specifically object to any irregularities which could have attended the view. Cf: *Greenberg* v. *City of Waterbury* (1933), 117 Conn. 67, 167 A. 83.

It must be noted that whether the trier of fact shall view the premises involved rests in the sound discretion of the trial court; and is not reviewable in the absence of a demonstrated abuse thereof. See: *Jackson Hill Coal, etc. Co.* v. *Bales* (1915), 183 Ind. 276, 108 N.E. 962;

*City of Indianapolis etc.* v. *Walker et al.* (1960), 132 Ind. App. 283, 168 N.E.2d 228 (transfer denied). The judge's viewing of the premises is not evidence. *Moore* v. *Ryan* (1919), 188 Ind. 345, 123 N.E. 642. Rather, it is permitted so as to enable the court to more clearly understand the evidence given at trial. *DeArmond et al.* v. *Carter d/b/a, etc.* (1956), 127 Ind. App. 34, 134 N.E.2d 239 (transfer denied). Appellants claim to have been prejudiced for the reason that there "could [be included] things prejudicial to either party or not relevant." (Appellants' brief, p. 22) This, however, falls short of an affirmative showing of an abuse of discretion where appellants received notice that a view was to take place, see: *Highbarger* v. *Thornock* (1972), 94 Idaho 829, 498 P.2d 1302; and did not, thereafter, attend. Furthermore, while the trial court should have made appropriate docket entries noting the date and time at which the view took place, if in fact it was conducted, appellants have not shown that they were prejudiced by the trial court's failure to do so.

No reversible error having been demonstrated, the judgment of the trial court is affirmed.

Affirmed.

Staton, P.J. and Garrard, J., concur.