Robert R. LAUX and Laura L. Laux,
Defendants–Appellants,

v.

CHOPIN LAND ASSOCIATES, INC.,
Plaintiff–Appellee.

No. 57A03–8907–CV–305.

Court of Appeals of Indiana,
Third District.

Feb. 15, 1990.

M. Robert Benson and Timothy Logan, Benson, Pantello, Morris & James, Fort Wayne, for defendants-appellants.

David C. Ford, Gen. Counsel, Indiana Farm Bureau, Inc., Indianapolis, for amicus curiae.

Edward L. Murphy, Jr., Philip A. Renz, and Larry L. Barnard, Miller Carson & Boxberger, Fort Wayne, for plaintiff-appellee.

GARRARD, Judge.

The plaintiff-appellee (Chopin) has petitioned the court for rehearing asserting that we erroneously reported the date its action was commenced and erred in the proper interpretation of the Indiana Right-to-Farm Act, IC 34–1–52–4.

We grant rehearing and vacate the former opinion in this case.

The record discloses that in June 1986 Lauxes listed for sale with a local real estate dealer approximately 113 of the 123 acres they owned and farmed in Whitley County, Indiana. They intended to retain the remaining ten acres which surrounded their home.

In late July or early August Lauxes' sons purchased 29 feeder hogs and had them delivered to Lauxes' property. Initially the hogs were raised in a vacant implement shed. The size of the hog raising operation grew and at the time of sale closing in December 1986 Lauxes were feeding between 85 and 90 hogs. In March 1987 Lauxes commenced construction of a hog raising facility which was put into use in late May or early June 1987. During the summer of 1987 the number of hogs increased to between 300 and 350 in a farrow-to-finish operation.

Meanwhile, on August 14, 1986, several individuals had made a proposal to Lauxes to purchase the 113 acres being offered for sale. Negotiations continued through the fall, an agreement was reached and the sale was closed on December 2, 1986. Title was to be placed in the name of Chopin, which was subsequently incorporated in January 1987.

At all pertinent times the entire area was zoned for agricultural uses. While the purchasers advised Lauxes that they intended to use the land for the purpose of developing large residential tracts, the land has been actually used as a grain farm since the sale.

No tracts have been sold nor residences built, but Chopin lost an opportunity to sell a portion of the real estate to a physician because of odors produced by the hog raising operation.

Additionally, the trial court found that Mr. Popp of Chopin first learned of the hogs in late June of 1987 and protested to Lauxes. In August he caused a notice to be served upon them requesting abatement of a nuisance.

Chopin commenced suit on January 19, 1988, to abate the hog operation as a nuisance. Lauxes answered asserting *inter alia* that they were entitled to the protection of the Right-to-Farm Act, IC 34–1–52–4.

The trial court, after hearing, entered its special findings of fact and conclusions thereon. It determined that the odor generated by the hog raising operation constituted a nuisance, and enjoined the Lauxes from maintaining, assisting or permitting the operation of any feeder hog operation on the 10.673 acres and to refrain from conducting or permitting any livestock raising operation on that real estate. This appeal followed.

In 1981 the Indiana legislature amended IC 34–1–52–1 *et seq.* concerning actions for nuisance by adding a new section often referred to as the Right-to-Farm Act.

This section, IC 34–1–52–4, declares the policy of this state to conserve, protect and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. It further states the purpose of the section to be to reduce the loss to the state of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance, noting that when non-agricultural land uses extend into agricultural areas, nuisance suits against agricultural uses are often the result.

The critical provisions of the section state:

(f) No agricultural or industrial operation or any of its appurtenances shall be or become a nuisance, private or public, by any changed conditions in the vicinity of the locality after the agricultural or industrial operation, as the case may be, has been in operation continuously on the locality for more than one year, provided:

(1) There is no significant change in the hours of operation;

(2) There is no significant change in the type of operation; and

(3) The operation would not have been a nuisance at the time the agricultural or

industrial operation, as the case may be, began on that locality.

(g) This section does not apply whenever a nuisance results from the negligent operation of an agricultural or industrial operation or its appurtenances.

The statute is essentially a non-claim statute. Thus, if the operation was not an actionable nuisance at the time it was begun, and if it is engaged in continuously for more than a year on that locality, then it will not become a nuisance because of any subsequent changed conditions in the vicinity. In other words, activities or uses subsequently "coming to the nuisance" will have no claim for its abatement.

The statute imposes three conditions, or limitations on that bar. Subsection (g) removes from the protection of the statute nuisances which result from negligent operation.

In addition, subsections (f)(1) and (2) remove the bar where there has been either a significant change in the hours of operation or a significant change in the type of operation. Because the language of the statute makes it applicable to any given point in time, the effect of a significant change in either hours of operation or type of operation is to again invoke the statutory conditions and recommence the running of the statutory clock. If then the operation was not an actionable nuisance when the change occurred (i.e., went into effect), it will not become one by virtue of changed conditions in the vicinity which occur more than a year after the operation continuously exists in the changed form. *See* Hand, *Right-to-Farm Laws—Breaking New Ground in the Preservation of Farmland,* 45 U.Pitt.L.Rev. 289, 308–09.

In *Erbrich Products Co. v. Wills* (1987), Ind.App., 509 N.E.2d 850 our First District considered the statute's application to industrial operations. It determined that the burden of proof as to subsection (f) rested with the party claiming the benefit of that provision. It also determined that subsection (g) concerning negligent operation is an exception to subsection (f)'s application and the burden of proof for the exception rested upon the party opposing the applica-

tion of the statutory defense. 509 N.E.2d at 858. The court in *Erbrich* was not directly concerned with which party bears the burden of proving the existence or non-existence of the three numbered provisos to subsection (f) that there be no significant change in hours of operation, and that the operation would not have been a nuisance at the time it began on that locality. Nevertheless, the reasoning employed by the court on general principles of evidence involving statutory exceptions clearly indicates that the court would have placed the burden of establishing compliance with the provisos upon the party claiming the benefit of the statute.

We therefore accept *Erbrich* as establishing the allocation of the burden of proof under the statute.

■ Turning to the case at hand, we note that when the trial court is required to enter special findings, as it was in this case, then those findings must be sufficient to disclose a valid basis under the issues for the legal result reached. *In re Miles* (1977), 173 Ind.App. 5, 362 N.E.2d 171. We may not affirm the judgment on any ground supported by the evidence, but must determine instead if the specific findings are sufficient to support the decision. *Dotlich v. Dotlich* (1985), Ind.App., 475 N.E.2d 331; *Orkin Exterminating Co. v. Walters* (1984), Ind.App., 466 N.E.2d 55.

■ In this case the court made no finding that Lauxes' hog raising operation would have been a nuisance absent any changes in the vicinity or that the facility was being operated negligently. Additionally, we note that Indiana has determined that the raising of hogs is not a nuisance *per se. Shatto v. McNulty* (1987), Ind. App., 509 N.E.2d 897; *Yeager and Sullivan, Inc. v. O'Neill* (1975), 163 Ind.App. 466, 324 N.E.2d 846.

In its conclusions the trial court stated that the commencement of the hog raising operation constituted a significant change in the type of operation conducted by Lauxes "and increasing the operation from 29 hogs in August of 1986 to between two and

three hundred by the summer of 1987 was another significant change."

In its findings (which were sustained by the evidence) the court determined that prior to August 1986, the land had been used for grain farming and in August the Lauxes commenced a hog raising operation. It also found that hog raising produced a distinctive and unpleasant odor. We agree that the findings sustain the conclusion that within the meaning of IC 34–1–52–4 the original change to a hog raising operation constituted a significant change in the type of operation.

█ The conclusion concerning a second change is much more troublesome. The requirement for invoking the statute is that there be no significant change in the *type* of operation. Since the statute supplies no definition of that term, we think it must be taken in its ordinary sense, as referring to qualities common to a number of items, individuals or activities which distinguish them as an identifiable class. It follows that merely increasing or decreasing the size or numbers of an operation will not serve to change the type of operation. That is not to say, however, that other changes which occur as a part of or incidental to a change in size may not indeed work a change in the type of an operation. It does say that merely determining that numbers have increased is insufficient to support a conclusion that there has been a significant change in the type of an operation.

Here the only special findings to support the court's conclusion of a second significant change in the type of operation were its findings concerning the increase in the number of pigs and its findings that Lauxes constructed a facility for the hogs in the spring and summer of 1987. Those findings are not sufficient to sustain the conclusion of a significant change in the type of operation.

█ Another problem arises from the court's determination that IC 34–1–52–4 was inapplicable. The statute provides that no agricultural operation will become a nuisance "by any changed conditions in the vicinity ... after the agricultural [oper-

ation] ... has been in operation continuously on the locality for more than one (1) year...."

The question then arises as to what constitutes a changed condition in the vicinity. Clearly, the principal scenario envisioned by the legislature arises when people build and move into residences close by a theretofore permissible agricultural or industrial operation. They then become disturbed over noise, odors, etc. and wish to have the offensive activity abated.

As already noted, the court's findings support the conclusion that there was a significant change in the type of agricultural operation conducted by Lauxes in August 1986. Since the court made no determination that their operation constituted an actionable nuisance at the time it began, we can assume for the purpose of analysis that the injurious effect (*see* IC 34–1–52–1 and –2) occurred because of the impact of the operation's odors on proposed residential development.

Yet during the one year period following August 1986, there were no residences built, no platting of a subdivision or change in the agricultural zoning. The court did find that due to the odor from the activity Chopin lost the opportunity to sell a portion of its real estate to a physician. That finding alone would appear insufficient to ground a determination that there had been such a change in conditions in the vicinity as to make hog raising an actionable nuisance and terminate the running of the statutory one year clock.

The court's other findings concerning the Chopin tract establish that Chopin paid more than the average market price for the land for agricultural purposes; that Lauxes were aware that Chopin was purchasing for residential development and sold the land for development purposes.

Such findings might be indicative of a basis for determining that Lauxes should be equitably estopped from claiming the benefit of the Right-to-Farm statute, but the court entered no findings or conclusions concerning estoppel. Therefore, we may not treat them on that basis. While

they demonstrate an intention to change the conditions in the vicinity by beginning a residential development, we believe they are inadequate to demonstrate that such a change has in fact occurred so as to preclude the agricultural operator from establishing the one year continuous operation required by the statute.

 Finally, we note that in all events the court's injunction prohibiting Lauxes from conducting or permitting "any livestock raising operation" on their land is overbroad. *See, e.g., Kuhn v. Wood* (1941), 34 Ohio L.Abs. 265, 268, 36 N.E.2d 1006, 1008; *Cook v. Hatcher* (1932), 121 Cal.App. 398, 405–06, 9 P.2d 231, 234.

We realize that when the hearing was conducted herein neither the trial court nor the parties had available to them any detailed interpretation concerning the application of the Right-to-Farm Act. Under the circumstances it appears that fairness dictates that the parties should be entitled to develop their evidence in the light of our decision today. Therefore, we reverse and remand for a new hearing.

Reversed and remanded.

STATON and BUCHANAN, JJ., concur.