**Fred D. SHATTO and Opal J. Shatto, Plaintiffs-Appellants,**

v.

**James E. McNULTY, Defendant-Appellee.**

**No. 40A01–8609–CV–244.**

Court of Appeals of Indiana, First District.

July 9, 1987.

Michael L. Rogers, Rogers and Dove, North Vernon, for plaintiffs-appellants.

Harold H. McConnell, Corinne R. Finnerty, North Vernon, for defendant-appellee.

M. Owen Mohler, Indianapolis, for amicus curiae.

NEAL, Judge.

### STATEMENT OF THE CASE

Plaintiffs-appellants, Fred D. Shatto and Opal J. Shatto (the Shattos), appeal a judgment rendered in the Jennings Circuit Court denying their suit for the abatement of a nuisance and damages brought against defendant-appellee, James E. McNulty (McNulty). Indiana Farm Bureau, Inc. has filed an amicus curiae brief in support of appellee.

We affirm.

### STATEMENT OF THE FACTS

The facts most favorable to support the judgment are as follows. McNulty purchased his 114–acre farm in Jennings County in 1956, which purchase included five sows and 40 or 50 pigs. On the premises stood a barn which later became the focal point of this controversy. The sows and pigs were confined in the barn at times, but were also confined on the property west of McNulty's house. Prior to its acquisition by McNulty, the farm had been used to raise hogs for some indeterminate time. The area is rural, containing farmers who likewise raise hogs, and is zoned for agricultural use. McNulty has continuously confined hogs on his property, including the barn area, from 1956 until the present. Only briefly, from the middle of 1971 to the beginning of 1972, were hogs absent from the premises. During this time, hog houses were built, rebuilt, altered, and repaired. The number of hogs existing on the property at any one time ranged from 50 to 100, the highest estimate being 150. In addition to the hogs, McNulty kept cattle.

In 1968, the Shattos, who lived in Columbus, Indiana, purchased 15 acres of unimproved land across the road and north of McNulty's farm. Although their property had a 700–foot frontage, the Shattos built a residence in 1970 just 50 feet east of the west boundary of their property, directly across from McNulty's barn containing the hog operation. The Shattos acknowledged

that they were aware of the barn, and conceded that they made no effort to discover its use, or to discover whether any kind of hog operation was being conducted on McNulty's farm. The barn has not been changed, but a concrete slab has been poured in its vacinity. About 30% of McNulty's hog operation is visible from the Shattos' front porch. For a time, the Shattos raised hogs themselves. McNulty's hog operation was not a total confinement operation.

In 1970 the Shattos commenced to complain of odors and flies. At trial, witnesses, including McNulty, residents of the area, other farmers, and persons experienced in hog operations testified that McNulty's operation was not being conducted negligently. They stated that there was very little accumulation of manure, no dead animals, and that the rain did not cause manure to run-off into either ditches and streams, or upon neighboring property. It was an above-average operation for hog farms. All conceded that odor from hog farming may exist from time to time, and that the odor from McNulty's operation was not excessive.

Ultimately, the Shattos filed this suit, seeking both abatement of a nuisance and monetary damages. After a bench trial, the trial court viewed the premises pursuant to motion and entered special findings of fact and conclusions of law as requested. The trial court found that McNulty had raised hogs on the premises from 1956 to the present, except for short intervals. It found that McNulty had never been negligent, nor had McNulty changed his hours or type of operation. The trial court found that McNulty's hog operation was not now and had never been a nuisance, and it held that the case was governed by IND. CODE 34-1-52-4. Injunctive relief and monetary damages were thereupon denied.

## ISSUES

The Shattos present two issues for review:

I. Whether McNulty's hog operation was a common law nuisance as a matter of law.

II. Whether IND.CODE 34-1-52-4 is a defense to McNulty from having his feed lot considered a common law nuisance.

We shall discuss the two issues together.

## DISCUSSION AND DECISION

Our oft-quoted standard of review was stated in *Sherk v. Indiana Waste Systems, Inc.* (1986), Ind.App., 495 N.E.2d 815, 817, which is cited by both parties:

"Sherk is appealing a negative judgment. A negative judgment may be challenged on appeal only as being contrary to law. A decision is contrary to law only where the evidence and all reasonable inferences therefrom leads to one conclusion and the trial court has reached a different one. We neither reweigh the evidence nor judge the credibility of witnesses. Where the party bearing the burden of proof receives a negative judgment we will not disturb it if there is any evidence or reasonable inferences arising therefrom which support the judgment. It is the function of the trier of fact to resolve any conflicts in the evidence." (Citations omitted.)

Though acknowledging this standard, the Shattos still argue that the judgment is contrary to law, and that all reasonable inferences to be drawn from the evidence lead to the singular conclusion that McNulty's hog operation constitutes a common law nuisance. They rely primarily upon *Sherk, supra*, and *Yeager and Sullivan, Inc. v. O'Neill* (1975), 163 Ind.App. 466, 324 N.E.2d 846.

We find little dispute in the law of nuisance. IND.CODE 34-1-52-1 defines a nuisance as:

"Whatever is injurious to health, or indecent, or offensive to the senses, or an obstruction to the free use of property, so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action."

A brief review of *Sherk* and *Yeager* reflect that, when deciding whether or not the use of property amounts to a nuisance,

it is necessary to balance the competing interests of the affected landowners, and in doing so we must use a common sense approach. While mere annoyances or inconveniences will not support an action on account of a nuisance, one may not use his property for his own profit so as to damage, confiscate, or destroy the property of his neighbor. Even a lawful business may be conducted in such a manner or be so situated as to become a nuisance. Whether the act complained of is in reality a nuisance, or not, is measured by ordinary sensibilities, tastes, and habits in light of the circumstances of each case. Addressing hog farming, *Yeager* states:

> "As set forth in 3 <u>Blackstone's Commentaries</u>, at 217, the learned writer noted that 'if a person keeps his hogs, or other noisome animals, so near the house of another, that the stench of them incommodes him and makes the air unwholesome, this is an injurious nuisance, as it tends to deprive him of the use and benefit of his house.' (Footnote omitted.) Blackstone quotes Lord Mansfield as having said that ' "it is not necessary that the smell should be unwholesome; it is enough if it renders the enjoyment of life and property uncomfortable." (1 Burr., 337).' 3 <u>Blackstone's Commentaries</u>, at 217, footnote (2). 66 <u>C.J.S. Nuisances</u> sec. 23d, at 778–779. While the keeping of hogs, being a lawful enterprise, cannot be characterized as an absolute nuisance or a nuisance, *per se, see: Meinecke v. Stallsworth* (Mo.App.1972), 483 S.W.2d 633; 66 <u>C.J.S. Nuisance</u> sec. 33, at 787–788; such an activity can become a nuisance *per accidens* by reason of the manner in which the hogs are kept, the locality or both. *Bower v. Hog Builders, Inc.* (Mo.1970), 461 S.W.2d 784. A lawful business may be conducted in such a way as to constitute a nuisance. *Muehlman, et ux. v. Keilman, et ux.* (1971) 257 Ind. 100, 272 N.E.2d 591. *Griffin v. Hubbell* (1937), 212 Ind. 684, 11 N.E.2d 136; *Owen et al. v. Phillips et al.* (1881), 73 Ind. 284; *Cox v. Schlachter* (1970), 147 Ind.App. 530, 262 N.E.2d 550 (transfer denied); *Lake Shore, etc., R. Co. v. Chicago, etc., R. Co.* (1910), 48

Ind.App. 584, 92 N.E. 989, 95 N.E. 596 (transfer denied); *Pritchett v. Board, etc.* (1908), 42 Ind.App. 3, 85 N.E. 32. And, it is for the trier of fact to determine whether that which is not in itself a nuisance is a nuisance in fact. 66 <u>C.J.S. Nuisances</u> sec. 153, at 960."

163 Ind.App. at 474, 324 N.E.2d at 851–52.

The Shattos argue that the judgment is contrary to law in that all reasonable inferences to be drawn from the evidence lead to the conclusion that McNulty's hog operation constitutes a common law nuisance. They cite their own evidence, which tended to show that the feed lot came into existence in 1979; that they made an inspection prior to building their home (though the transcript reflects that Fred Shatto acknowledged he did not); that the locality of the hogs changed and their number increased; and that there were no hogs on the farm in the 1970's. They also cite their own evidence that odors and flies from the hog operation made them physically ill and embarrassed them and their guests. In short, they ask us to reweigh the evidence and redetermine the credibility of the witnesses. That was the function of the trier of fact, which also had the function of determining whether or not the operation was a nuisance. *See Yeager, supra.*

The trial court found against the Shattos. The evidence most favorable to the judgment supports that decision.

The trial court considered IND.CODE 34-1-52-4 as controlling. We agree. That statute provides:

> "(a) The general assembly declares that it is the policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. The general assembly finds that when nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits. As a result, agricultural operations are sometimes forced to cease operations, and many persons may be discouraged from making investments in farm improvements. It is the purpose of this section to reduce the loss

to the state of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance.

(b) As used in this section, 'agricultural operation' includes any facility used for the production of crops, livestock, poultry, livestock products, poultry products, or horticultural products or for the growing of timber.

(c) As used in this section, 'industrial operation' includes any facility used for the manufacture of a product from other products, for the transformation of a material from one [1] form to another, for the mining of a material and related mine activities, or for the storage or disposition of a product or material.

(d) As used in this section, 'locality' means the specific area of land upon which the operation is conducted.

(e) For purposes of this section, the continuity of an agricultural or industrial operation shall be considered to have been interrupted when it has been discontinued for more than one year.

(f) No agricultural or industrial operation or any of its appurtenances shall be or become a nuisance, private or public, by any changed conditions in the vicinity of the locality after the agricultural or industrial operation, as the case may be, has been in operation continuously on the locality for more than one year, provided:

(1) There is no significant change in the hours of operation;

(2) There is no significant change in the type of operation; and

(3) The operation would not have been a nuisance at the time the agricultural or industrial operation, as the case may be, began on that locality.

(g) This section does not apply whenever a nuisance results from the negligent operation of an agricultural or industrial operation or its appurtenances."

Based upon the evidence most favorable to the trial court's decision, we are of the opinion that IND.CODE 34–1–52–4 is applicable. The policy of the legislature is clear. People may not move to an established agricultural area and then maintain an action for nuisance against farmers because their senses are offended by the ordinary smells and activities which accompany agricultural pursuits. Exceptions exist where there are changes in the activities, the activities were a nuisance in the first place without consideration of the changed conditions, and negligence. The Shattos argue that there have been significant changes in the feed lot activities, the locality of the operation changed, the nuisance statute has no retroactive effect, and the hog operation began in 1979, after they had moved there. Other than the argument concerning the retroactive effect of the statute, these arguments are factual considerations which were determined adversely to them on conflicting evidence. We are of the opinion that the statute, enacted in 1981, applies to any premises with a history of agricultural activities. The Shattos' bare assertion to the contrary does not persuade us.

We must observe that pork production generates odors which cannot be prevented, and so long as the human race consumes pork, someone must tolerate the smell. IND.CODE 34–1–52–4 addresses that fundamental fact and protects pork production when it is confined to its natural habitat, that is, rural farm communities such as Jennings County.

For the above reasons, this cause is affirmed.

Judgment affirmed.

RATLIFF, C.J., and BUCHANAN, J., concur.