
FILED
Apr 22 2019, 5:29 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

**ATTORNEYS FOR APPELLANTS**

Kim E. Ferraro
Samuel J. Henderson
Gary, Indiana

**ATTORNEYS FOR AMICUS CURIAE
HENDRICKS COUNTY**

Gregory E. Steuerwald
Graham T. Youngs
Danville, Indiana

**ATTORNEY FOR AMICUS CURIAE
THE INDIANA BANKERS ASSOCIATION**

Martha R. Lehman
Indianapolis, Indiana

**ATTORNEYS FOR AMICUS CURIAE
INDIANA AGRICULTURAL LAW
FOUNDATION, INC.**

Todd J. Janzen
Brianna J. Schroeder
Indianapolis, Indiana

**ATTORNEYS FOR AMICUS CURIAE
INDIANA PORK PRODUCERS
ASSOCIATION, INC.**

Daniel P. McInerny
Andrew M. McNeil
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEES**

Christopher J. Braun
Jonathan P. Emenhiser
Justin A. Allen
Indianapolis, Indiana

**ATTORNEYS FOR APPELLEES-
INTERVENOR STATE OF INDIANA**

Curtis T. Hill, Jr.
Attorney General of Indiana

Aaron T. Craft
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Janet L. Himsel, Martin Richard Himsel, Robert J. Lannon, Susan M. Lannon,

*Appellants-Plaintiffs,*

v.

Samuel Himsel, Cory M. Himsel, Clinton S. Himsel, 4/9 Livestock, LLC and Co-Alliance, LLP,

*Appellees-Defendants,*

and

State of Indiana,

*Appellee-Intervenor.*

April 22, 2019

Court of Appeals Case No. 18A-PL-645

Appeal from the Hendricks Superior Court

The Honorable Mark A. Smith, Judge

Trial Court Cause No. 32D04-1510-PL-150

**Altice, Judge.**

## Case Summary

[1] Martin Richard Himsel, Janet L. Himsel, Robert J. Lannon, and Susan M. Lannon (collectively, the Plaintiffs) filed a complaint, alleging nuisance, negligence, and trespass, against Samuel T. Himsel, Cory M. Himsel, Clinton S. Himsel, 4/9 Livestock, LLC, and Co-Alliance, LLP (collectively, the

Defendants). Specifically, the Plaintiffs alleged in their complaint that the concentrated animal feeding operation (CAFO) placed on 4/9 Livestock's property in 2013 created noxious odors that are so extreme as to greatly diminish the Plaintiffs' quality of life, reduce their property values, and alter their daily activities. In their complaint, the Plaintiffs also challenged the constitutionality of Ind. Code § 32-30-6-9, which is commonly known as the Right to Farm Act (the RTFA), and Ind. Code § 15-11-2-6(a),[1] which requires the Indiana Code to be construed to "protect the rights of farmers to choose among all generally accepted farming and livestock production practices, including the use of ever changing technology."

[2] The Defendants moved for summary judgment on all claims, and, thereafter, the Plaintiffs filed a motion for partial summary judgment regarding their constitutional challenges. Following a hearing, the trial court granted summary judgment in favor of Clinton, Cory, and Samuel Himsel (the Individual Himsel Defendants) but otherwise denied both motions for summary judgment. The Defendants filed a motion to correct error, once again seeking summary judgment on all claims against them. Amici curiae – the Indiana Agricultural Law Foundation (IALF) and Hendricks County – filed briefs in support of the Defendants' motion to correct error. In addition to opposing the Defendants'

---

[1] We will refer to this statute as the Agricultural Canon.

motion to correct error, the Plaintiffs asserted cross-error regarding the trial court's grant of summary judgment to the Individual Himsel Defendants.

[3] The trial court granted the Defendants' motion to correct error and then entered summary judgment in favor of the Defendants on all claims. On appeal, the Plaintiffs challenge the entry of summary judgment.

[4] We affirm.

## Facts & Procedural History

[5] Samuel Himsel has farmed in rural Hendricks County his entire life. His sons, Cory and Clinton, also make their living farming in the county. In 2012, the three decided to start a hog-raising operation, and, in January 2013, they formed 4/9 Livestock. The Individual Himsel Defendants are the sole members of 4/9 Livestock. The Individual Himsel Defendants decided to locate the 4/9 Livestock operation at 3042 North 425 West in Danville (the Farm), which property had been in their family for more than two decades. Samuel's parents acquired this farmland in the early 1990s, and the land had been used for agricultural purposes since at least 1941. Between at least 1994 and 2013, the Farm had been used consistently for crops.

[6] In February 2013, Samuel submitted a rezoning petition to the Hendricks County Area Plan Commission to rezone 58.42 acres of farmland on the Farm. The land was zoned agricultural residential (AGR), and Samuel petitioned for it to be rezoned agricultural intense (AGI), which allows for CAFOs. Following

a public hearing on March 12, 2013, at which Richard Himsel spoke in opposition to the rezoning, the Plan Commission unanimously recommended approval of the requested rezoning. In doing so, the Plan Commission made the following written findings:

(1) **The comprehensive plan[:]** The Commission finds that the proposal does substantially comply with the recommendations of the Hendricks County Comprehensive Plan…. The Comprehensive Plan expressly lists confined animal feeding operations as a recommended land use in the area under consideration.

(2) **Current conditions and the character of current structures and uses in each district[:]** The Commission finds that the proposal is consistent and compatible with the character of current structures and uses in the zoning district…. The area is a well-established, longstanding agricultural community. Furthermore, the proposed use is an agricultural use expressly recognized in the current Comprehensive Plan.

(3) **The most desirable use for which the land in each district is adapted[:]** The Commission finds that the proposal does represent the most desirable use for which the land is adapted. The 1983, 1998, and 2008 Comprehensive Plans have consistently recommended that the area be for agricultural use. This represents a longstanding community desire to see this area remain agricultural in character. The proposed use is expressly listed in the current Comprehensive Plan as a characteristic and desirable use in this area.

(4) **The conservation of property values throughout the jurisdiction[:]** The Commission finds that the proposal does conserve property values….

(5) **Responsible development and growth[:]**  The Commission finds that the proposal does represent responsible development and growth.  The area under consideration is an integral part of the historically rural agricultural west side of Hendricks County.  The last three Comprehensive Plans have recognized this part of the County as being characteristically agricultural and have reserved the area for agricultural uses in the future.  This reflects the County's longstanding desire to, in general, plan for urbanization of its east side while maintaining the rural character of its agricultural west side.  The proposal under consideration is consistent and compatible with the County's long term land use planning goals.

*Appellants' Appendix Vol. IV* at 107-08.

[7]  On March 26, 2013, the County Commissioners unanimously approved the rezoning and adopted the Plan Commission's findings.  After the property was rezoned, it was transferred from Samuel to 4/9 Livestock.  The Plaintiffs did not appeal the rezoning decision.  Thereafter, before improvement location permits were granted, the Plan Commission held two public hearings regarding the siting, design, and construction plans for the Farm's CAFO, which included the construction of two 4000-hog production buildings.  Additionally, in May 2013, the Indiana Department of Environmental Management (IDEM) approved two permits to construct and operate the CAFO buildings on the Farm.  The Plaintiffs did not appeal IDEM's permit approvals.

[8]  On July 1, 2013, 4/9 Livestock entered into a hog finishing contract with Co-Alliance.  Under the contract, Co-Alliance would supply the hogs and 4/9 Livestock would raise them.  4/9 Livestock was to operate as an independent

contractor. Once fully grown, which was within about six months, the hogs would be shipped out of the CAFO by Co-Alliance and a new batch of young hogs would come into the CAFO. On July 19, 2013, 4/9 Livestock and PNC Bank entered into a convertible line of credit note for a seven-figure amount to finance the construction of the CAFO. Shortly after construction was completed, the CAFO buildings were populated with hogs on October 2, 2013. Since the CAFO began operating there have been no violations cited by either IDEM or Hendricks County relating to its operation.

[9] The Plaintiffs live in the immediate vicinity of the Farm. Richard and Janet Himsel (collectively, the Himsel Plaintiffs) moved into their home in 1994. Their home is on a farm where the Himsel Plaintiffs raised livestock and grew crops until 2000, when they retired and sold much of their farmland. Richard grew up on this farm, and the farmhouse has stood since 1926. Robert Lannon built his home in 1971 and married his wife Susan in 1974. They have never farmed on their property but are accustomed to the usual smells that come with living in farm country, having lived there for over forty years.

[10] The Farm and the Plaintiffs' properties are located in western Hendricks County in an area that the county's Board of Commissioners has expressly designated for agricultural purposes since the adoption of the county's first

comprehensive plan in 1983.[2] The nearest town is over five miles away, and the nearest residential subdivision is about two miles away.

[11] Agricultural uses have dominated in the area surrounding the Farm and the Plaintiffs' properties. In addition to row crops, those uses have included raising livestock such as cattle, hogs, chicken, goats, and sheep. In fact, Richard Himsel and his father raised livestock, including 200 head of hogs and 200 head of cattle at a time, in the area directly adjacent to their home for years. For about two years, Richard had a confinement building on his property, approximately 700 feet from his home, that held up to 400 head of hogs. This building was destroyed by fire and not rebuilt. Another farmer, John Hardin, has a hog confined feeding operation located near the Plaintiffs' properties. Hardin has been operating his hog farm for many years and periodically applies hog manure to fields as close as twenty feet from the Himsel Plaintiffs' home.

[12] On October 6, 2015, the Plaintiffs filed the instant action raising claims of nuisance, negligence, and trespass against the Defendants and seeking a declaratory judgment that the Agricultural Canon is facially unconstitutional. The Defendants' answer raised the RTFA as an affirmative defense. The State of Indiana intervened to defend the constitutionality of the challenged statute.

---

[2] Similar plans were adopted in 1998 and 2008. Notably, the AGI zoning district was not created until the 2008 comprehensive plan. The AGI district "serves to provide adequate and appropriate locations for intense agricultural uses such as CAFO's [sic] or agricultural businesses that may emit intense odors, vibrations, air pollution, or other disruptions." *Appellants' Appendix Vol. VIII* at 22.

Thereafter, the Plaintiffs amended their complaint to add as-applied constitutional challenges to application of the RTFA as a defense in this case.

[13] The Defendants moved for summary judgment with respect to all claims in November 2016, and the Plaintiffs then filed a motion for summary judgment on the constitutionality of the RTFA and the Agricultural Canon. The motions were extensively briefed and supported by a significant amount of designated evidence. On September 27, 2017, the trial court held a summary judgment hearing regarding both motions.

[14] On October 24, 2017, the trial court entered a summary judgment order with extensive findings and conclusions. The court granted summary judgment in favor of the Individual Himsel Defendants but otherwise denied the summary judgment motions. Thereafter, on November 22, 2017, the Defendants filed a motion to correct error. Briefs in support of the motion were filed by putative amici IALF and Hendricks County. The trial court granted the amici's motions for leave to appear. Thereafter, on December 21, 2017, the Plaintiffs filed their response to the motion to correct error and asserted cross-error regarding the grant of summary judgment to the Individual Himsel Defendants.

[15] The trial court held a hearing on the motion to correct error on January 24, 2018. Four days later, the trial court issued an order granting the motion to correct error, amending its prior conclusions, and granting summary judgment

in favor of the Defendants on all claims. The Plaintiffs now appeal.[3] Additional information will be provided below as needed.

## Standard of Review

Summary judgment orders are reviewed de novo on appeal, and we apply the same standard of review as the trial court. *Knighten v. E. Chicago Hous. Auth.*, 45 N.E.3d 788, 791 (Ind. 2015). The moving party must show there are no genuine issues of material fact and it is entitled to judgment as a matter of law. *Id.* In deciding whether summary judgment is proper, we consider only the designated evidence and construe all factual inferences in favor of the non-moving party. *Id.*

## Discussion & Decision

## Application of the RTFA

The Plaintiffs' complaint alleges that their use and enjoyment of their homes, as well as their homes' values, were ruined by noxious odors and airborne emissions coming from the CAFO. The RTFA, however, limits the circumstances under which agricultural operations[4] may be subject to nuisance claims. *See* I.C. § 32-30-6-9(d). The Defendants argue that the RTFA bars

---

[3] Several amici curiae briefs have been filed in support of the Defendants and the State as intervenor. Amici include the IALF, Indiana Pork Producers Association, Inc., Hendricks County, and the Indiana Bankers Association.

[4] I.C. § 32-30-6-1 defines "agricultural operation" to include "any facility used for the production of crops, livestock, poultry, livestock products, poultry products, or horticultural products or for growing timber."

Plaintiffs' nuisance claim, as well as their other related claims. The material facts in this case are not in dispute. Rather, the disagreement centers on the legal effect of the facts and interpretation of subsection (d)(2) of the RTFA.

[18] The RTFA, I.C. § 32-30-6-9, provides in relevant part:

> (a) This section does not apply if a nuisance results from the negligent operation of an agricultural … operation….
>
> (b) The general assembly declares that it is the policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for the production of food and other agricultural products. The general assembly finds that when nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits. As a result, agricultural operations are sometimes forced to cease operations, and many persons may be discouraged from making investments in farm improvements. It is the purpose of this section to reduce the loss to the state of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance.
>
> ***
>
> (d) An agricultural or industrial operation … is not and does not become a nuisance … by any changed conditions in the vicinity of the locality after the agricultural … operation … has been in operation continuously on the locality for more than one (1) year if the following conditions exist:
>
>> (1) There is no significant change in the type of operation. A significant change in the type of agricultural operation does not include the following:
>>
>>> (A) The conversion from one type of agricultural operation to another type of agricultural operation.
>>>
>>> (B) A change in the ownership or size of the agricultural operation.
>>
>> ….

> (D) Adoption of new technology by the agricultural
> operation.
>
> > (2) The operation would not have been a nuisance at the
> > time the agricultural … operation began on that locality.

The Plaintiffs concede that the agricultural operation here has been in operation continuously for more than one year. Indeed, the record establishes that the farmland in question has been actively farmed for decades. The Plaintiffs also acknowledge that no significant change has occurred in the type of the agricultural operation at the Farm, as strictly defined under subsection (d)(1) of the RTFA.[5] *See Parker v. Obert's Legacy Dairy, LLC*, 988 N.E.2d 319, 324 (Ind. Ct. App. 2013) (holding that cropland-to-CAFO conversion is not a significant change under the RTFA).

[19] The Plaintiffs contend that the RTFA is not a bar to their nuisance action, however, because the CAFO would have been a nuisance when farming originally began on the Farm. In other words, the Plaintiffs rely upon subsection (d)(2) of the RTFA, which requires that "[t]he operation would not have been a nuisance at the time the agricultural … operation began on that locality."

---

[5] Prior to an amendment to its current form in 2005, the RTFA required no significant change in the hours and type of operation. In addition to removing the no-significant-change-in-hours condition, the amendment set out a list of changes that *do not* amount to a significant change in the type of operation, including a change in the type of agricultural operation (*i.e.*, changing from crops to livestock), a change of ownership or size of the operation, and the adoption of new technology. In light of the amendment, it is difficult to imagine what would constitute a significant change in the type of operation.

[20] Contrary to the Plaintiffs' suggestion on appeal, we need not determine precisely when farming originally began on the Farm. The designated evidence establishes that the land had been used for row crops since at least 1941.[6] Further, the record clearly establishes that the Plaintiffs' non-farming use of their properties began well after 1941. The Lannons built their non-farming residence in 1971, and the Himsel Plaintiffs began using their home as a non-farming residence in 2000 after deciding to retire and sell most of their acreage.

[21] "The [RTFA], by its plain terms, was intended to prohibit nonarigultural land uses from being the basis of a nuisance suit against an established agricultural operation." *TDM Farms, Inc. of North Carolina v. Wilhoite Family Farm, LLC*, 969 N.E.2d 97, 111 (Ind. Ct. App. 2012). It is essentially a codification of the doctrine of coming to the nuisance. *Id*. at 110; *see also Shatto v. McNulty*, 509 N.E.2d 897, 900 (Ind. Ct. App. 1987) ("People may not move to an established agricultural area and then maintain an action for nuisance against farmers because their senses are offended by the ordinary smells and activities which accompany agricultural pursuits.").[7]

---

[6] During his deposition, Richard Himsel testified that the Farm had been used for farming his entire life and that prior to the CAFO the land had been used for "rotating crops, corn, soybeans, wheat, oats, probably had a year or two of hay in it when old Bill Wilder had it." *Appellants' Appendix Vol. III* at 191.

[7] Applying the original version of the RTFA from 1981 (Ind. Code § 34-1-52-4), this court observed: "[P]ork production generates odors which cannot be prevented, and so long as the human race consumes pork, someone must tolerate the smell. [The RTFA] addresses that fundamental fact and protects pork production when it is confined to its natural habitat, that is, rural farm communities such as Jennings County." *Shatto*, 509 N.E.2d at 900.

[22]     This is not a case where the Plaintiffs moved to the nuisance as that expression is typically understood. Indeed, the Farm did not change from crop farming to pig farming until well after the Lannons built their home and the Himsel Plaintiffs moved into theirs. Prior to the 2005 amendment to the RTFA, this would have constituted a significant change in the agricultural operation making the RTFA inapplicable. *See Wendt v. Kerkhof*, 594 N.E.2d 795, 798 (Ind. Ct. App. 1992) (farm changed from decades of grain farming to hog farming five years after plaintiffs became adjacent landowners), *trans. denied*. As noted above, however, the Plaintiffs acknowledge that in light of the 2005 amendment, the change in the agricultural operation here from crops to hogs did not constitute a significant change in the type of operation. *See Parker*, 988 N.E.2d at 324 ("By specifying that a conversion from one agricultural operation to another is not a significant change, the Act removes claims against existing farm operations that later undergo a transition from one type of agriculture to another."). Thus, the coming to the nuisance doctrine, as applied by the RTFA, now encompasses coming to the potential future nuisance.

[23]     Agricultural uses have dominated the landscape surrounding the Plaintiffs' properties, with a number of farmers in the area owning or having owned livestock. Richard Himsel, prior to retiring from farming, even had livestock on his property. The county's Plan Commission and County Commissioners recognized the well-established, longstanding agricultural community in which the Farm was situated and indicated the county's ongoing desire to maintain the rural character of Hendricks County's agricultural west side. Further, the

Comprehensive Plan for the area in question expressly lists CAFOs as a recommended land use.

[24] Robert Lannon knowingly built his residential home in the middle of farm country, and the Himsel Plaintiffs lived and farmed on their property for a number of years before selling off much of their land and changing the use of their home to purely residential. None of the Plaintiffs can now be heard to complain that their residential use of their property is being negatively impacted because the use of the Farm changed from crops to hogs, a use that would not have been a nuisance in or around 1941 when the agricultural operation began on the locality.

[25] The Plaintiffs contend that applying the RTFA in this manner will "have the extraordinary effect of removing *any* evidentiary burden by allowing CAFOs of *any size* to be built anywhere there is *any history* of agricultural activity." *Appellants' Brief* at 27 (emphases in original). We are not so sure. Moreover, we observe that requiring a defendant farmer to establish that his or her particular CAFO (rather than hog farming or CAFOs generally) would not have been a nuisance when the agricultural operation began on the locality would eviscerate the protections of the RTFA.

[26] The Plaintiffs' argument also ignores the significant local and administrative hurdles a farmer must overcome before being allowed to build a CAFO. In this case, after a number of public hearings and notices to adjoining landowners, the Defendants obtained rezoning of the Farm and building permits from the

county approving the specific siting, design, and construction plans for the CAFO's two buildings. The Plaintiffs did not seek judicial review of these decisions by county officials. The Defendants also applied for permits from IDEM for the construction and operation of the CAFO. The Plaintiffs did not appeal issuance of these permits. The Plaintiffs were provided ample due process to challenge the size and/or placement of the CAFO buildings on the Farm, yet they decided instead to wait and file a nuisance action more than two years later. In light of the RTFA, they put their eggs in the wrong basket. Their general nuisance claim fails as a matter of law.

[27] The RTFA provides an exception where an alleged nuisance results from the negligent operation of the agricultural operation or its appurtenances. *See* I.C. § 32-30-6-9(a). The designated evidence provides no indication that the CAFO has been negligently operated by 4/9 Livestock or has violated IDEM regulations. *See Lindsey v. DeGroot*, 898 N.E.2d 1251, 1260-62 (Ind. Ct. App. 2009) (addressing alleged operational negligence based on violations of IDEM regulations and concluding, on summary judgment, that the violations were not the proximate cause of the alleged injury); *see also Dalzell v. Country View Family Farms, LLC*, 517 F. App'x 518, 520 (7th Cir. 2013) ("Unless the nuisance 'results from' the negligence, and not just from the agricultural operation, the Act applies and defeats plaintiffs' claim."). Further, we agree with the Defendants and amici that the Plaintiffs' claim of negligent siting (*i.e.*, the

decision to build and operate a CAFO at a particular location)[8] cannot constitute negligent operation under the RTFA. If allowed, it would simply create an end run around the protections of the RTFA.

[28] The Plaintiffs also brought a trespass claim purportedly based on "the unlawful physical intrusion of the CAFO's noxious emissions into their properties and homes." *Appellants' Brief* at 39. They allege that the emissions – "animal waste, air pollutants, harmful gases, and noxious odors" – are chemical compounds that result in a physical, space-filling invasion into their homes. *Appellants' Appendix Vol. III* at 10. Despite artful pleading, we observe that application of the RTFA does not turn on labels. The trial court properly concluded that the Plaintiffs' trespass claim is barred by the RTFA. *See Ehler v. LVDVD, L.C.*, 319 S.W.3d 817, 824 (Tex. Ct. App. 2010) ("Permitting the [plaintiffs] to avoid the application of [the Texas RTFA] by pleading a nuisance action as a trespass would eviscerate the statute and deny [the defendants] the protection intended by the Legislature when it passed the Right to Farm Act.").

## Constitutional Claims

[29] The Plaintiffs contend that the RTFA is unconstitutional as applied to them because it violates the Open Courts Clause, the Takings Clause, and the Equal

---

[8] The Plaintiffs assert that "the CAFO Operators negligently sited, designed and built their 8,000-hog CAFO in an inappropriate location" and have continued to operate the CAFO "despite the now unmistakable effect on their neighbors". *Appellants' Brief* at 34. They claim that the Defendants had a duty to take reasonable care to "keep emissions of their CAFO from injuring their neighbors." *Id*. at 35. We reject the Plaintiffs' attempt to repackage their nuisance claim to avoid the effects of the RTFA.

Privileges and Immunities Clause of the Indiana Constitution, as well as the federal Takings Clause. In sum, they assert that application of the RTFA has deprived them of their ability to enforce their long-vested property rights in their homes. The Plaintiffs also assert a facial challenge to the Agricultural Canon.

We review the constitutionality of a statute de novo. *See Tyson v. State*, 51 N.E.3d 88, 90 (Ind. 2016). Statutes come before us "clothed with the presumption of constitutionality until clearly overcome by a contrary showing." *Zoeller v. Sweeney*, 19 N.E.3d 749, 751 (Ind. 2014). "The party challenging the constitutionality of a statute bears the burden of proof, and all doubts are resolved against that party and in favor of the legislature." *Id*.

## Open Courts Clause

The Plaintiffs first contend that the RTFA violates the Open Courts Clause, Article 1, Section 12 of the Indiana Constitution, which provides in relevant part: "All courts shall be open; and every person, for injury done to him in his person, property, or reputation, shall have remedy by due course of law." Our Supreme Court has made clear that this clause "does not prohibit all conditions on access to the courts, but it does prevent the legislature from arbitrarily or unreasonably denying access to the courts." *KS&E Sports v. Runnels*, 72 N.E.3d 892, 905 (Ind. 2017).

> The right of access presupposes an underlying cause of action to which the right of access attaches and for which the law affords a remedy. The legislature has wide latitude in defining the existence and scope of a cause of action and in prescribing the

available remedy. In *McIntosh v. Melroe Co.*, 729 N.E.2d 972 (Ind. 2000), we reaffirmed the legislature's longstanding prerogative "to modify or abrogate the common law." *Id.* at 977 (citations omitted). An important corollary is that "[i]f the law provides no remedy, [Article 1,] Section 12 does not require that there be one." *Id.* at 979.

*Id.* at 906.

[32] The Plaintiffs assert that they have a vested right to use and enjoy their property and that the RTFA has been unconstitutionally applied to deny their access to the courts to enforce that right. This argument misses the mark. The Open Courts Clause does not require the substantive law to provide a remedy, and individuals have no vested or property right in any rule of common law.[9] *McIntosh*, 729 N.E.2d at 978. Accordingly, "the General Assembly can make substantial changes to the existing law without infringing on citizen rights." *Id.*

[33] Here, the legislature has exercised its broad discretion and modified the substantive law of nuisance by eliminating a nuisance cause of action against agricultural operations except where the alleged nuisance is the result of negligent operation or where the conditions of I.C. § 32-30-6-9(d) are not met.

---

[9] The Plaintiffs curiously direct us to *Martin v. Richey*, 711 N.E.2d 1273 (Ind. 1999), to support their claim that they have a vested right to pursue a nuisance claim to protect their properties. *Martin*, however, is inapposite. In that case, the Supreme Court observed, "it cannot be questioned that, had plaintiff filed her medical malpractice claim within the two-year period, she could have pursued her otherwise valid tort claim." *Id.* at 1283. In this case, however, the Plaintiffs never had a valid tort claim because the facts underlying their nuisance claim occurred well after the RTFA went into effect and barred such a claim.

The RTFA is rational and falls comfortably within the legislature's legitimate constitutional authority.

## Takings Clauses

Article 1, Section 21 of the Indiana Constitution provides in part: "No person's property shall be taken by law, without just compensation; nor, except in case of the State, without such compensation first assessed and tendered." The Fifth Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, includes the same proscription against the taking of property without just compensation. *Lindsey*, 898 N.E.2d at 1257-58. We construe and analyze the "textually indistinguishable" takings clauses identically. *See Redington v. State*, 992 N.E.2d 823, 835 (Ind. Ct. App. 2013), *trans. denied*; *see also State v. Kimco of Evansville, Inc.*, 902 N.E.2d 206, 211-12 (Ind. 2009) ("our state constitutional takings analysis is the same as federal constitutional eminent domain law"), *cert. denied*.

"To be a taking in the constitutional sense, the state action at issue must be more than a consequential limitation on the use or enjoyment of property; a taking involves an actual interference with a property right." *Lindsey*, 898 N.E.2d at 1258 (rejecting plaintiffs' argument that the RTFA amounts to an unconstitutional taking because the act essentially awarded the defendant a nuisance easement over their property). In this case, the Plaintiffs assert a regulatory takings claim, as they acknowledge that there has been no direct

seizure of their property.[10] Regulation, however, effects a taking only where it "deprives an owner of all or substantially all economic or productive use of his or her property." *Biddle v. BAA Indianapolis, LLC*, 860 N.E.2d 570, 577 (Ind. 2007) (citing *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538-40 (2005)); *see also Lingle*, 544 U.S. at 539 ("our regulatory takings jurisprudence…aims to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or outs the owner from his domain"). "Factors considered under the foregoing test include the economic impact of the regulation on the property owner, the extent to which the regulation has interfered with distinct investment-backed expectations, and the character of the government action." *Kimco*, 902 N.E.2d at 211 (citing *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 124 (1978)).

[36] The State, as intervenor, asserts that a constitutional taking occurs only where the government, as opposed to a private party, directly or proximately causes the interference with the claimant's property. The State argues further that the Plaintiffs have no property interest in a particular cause of action or remedy. We find the State's argument compelling, but we need not make a determination in this regard because, even considering the regulatory takings factors, the Plaintiffs lose.

---

[10] The Plaintiffs' reliance on *Arkansas Game & Fish Comm'n v. U.S.,* 568 U.S. 23 (2012), and other similar flooding cases, is misguided and improperly conflates physical takings with regulatory takings. *See id*. (addressing recurrent government-induced flooding invasions and holding that such temporary physical occupations can constitute a compensable taking of property).

[37]     In *Biddle*, homeowners near the Indianapolis International Airport (owned by a municipal corporation) claimed that airplanes flying over their homes constituted a regulatory taking because the noise disturbed the use and enjoyment of their properties "by disrupting activities such as sleeping, talking, watching television or listening to the radio, hosting outdoor parties, reading, and opening windows." 860 N.E.2d at 573. Additionally, the homeowners claimed that their property values had decreased up to thirty-three percent. Our Supreme Court affirmed the grant of summary judgment in favor of the airport. In concluding as a matter of law that the aircraft noise had not effected a taking, the Court acknowledged that the noise was "no doubt considerable" but found that it did not "amount to a 'practical destruction' or 'substantial impairment' of Homeowners' use of their property." *Id*. at 580. The Court continued, "Homeowners still make many valuable uses of their properties in spite of the noise." *Id*.

[38]     Similarly, here, the Plaintiffs have not been deprived of all or substantially all economic or productive use of their properties. The designated evidence reveals that the Plaintiffs' properties have retained significant economic value. Indeed, their own expert valued the Lannons' property at $51,500 (at an estimated 60% loss in value) and the Himsel Plaintiffs' property at $181,2000 (at an estimated 49.5% loss in value) with the CAFO nearby. *Cf. Penn. Cent.*, 438 U.S. at 131 (with respect to land-use regulations, reasonably related to the promotion of the general welfare, diminution in property value, standing alone, does not establish a taking); *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) (75%

diminution in value caused by zoning law not found to be a taking). Moreover, they continue to reside in their residences, making valuable use of their properties, and have alleged no distinct, investment-backed expectations that have been frustrated by the CAFO. Finally, with respect to the character of the governmental action, we do not agree with the Plaintiffs that the RTFA has permitted a physical invasion of their property. While their property rights are clearly affected by application of the RTFA, the Plaintiffs cannot dispute that the regulation is reasonably related to the promotion of the common good. In sum, we conclude that the odorous emissions from 4/9 Livestock's CAFO do not effect a taking.

## Privileges and Immunities Clause

[39]     Article 1, Section 23 of the Indiana Constitution provides: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms, shall not equally belong to all citizens." Our Supreme Court has set out a two-part standard for determining a statute's validity where the statute grants unequal privileges or immunities to differing classes of persons.

> First, the disparate treatment accorded by the legislation must be reasonably related to inherent characteristics which distinguish the unequally treated classes. Second, the preferential treatment must be uniformly applicable and equally available to all persons similarly situated. Finally, in determining whether a statute complies with or violates Section 23, courts must exercise substantial deference to legislative discretion.

*Collins v. Day*, 644 N.E.2d 72, 80 (Ind. 1994); *see also Whistle Stop Inn, Inc. v. City of Indianapolis*, 51 N.E.3d 195, 198 (Ind. 2016). Presuming the statute to be constitutional, we place the burden on the challenger to "negative every conceivable basis which might have supported the classification." *Collins*, 644 N.E.2d at 80. Classification under Section 23 is primarily a legislative question, and it becomes a judicial question only where the lines drawn by the legislature appear arbitrary or manifestly unreasonable. *Id.*

[40]　The Plaintiffs assert that the RTFA splits county dwellers into two camps: (1) those currently engaged in agricultural operations on land that has been consistently farmed for at least the last year and (2) all others who live in the county. Those in the first group may sue those in either group for nuisance, while those in the second group may only sue those in their own non-farming group for nuisance.

[41]　Indeed, the RTFA affords preferential treatment to farmers, under certain statutory conditions, by conferring immunity from nuisance suits that are not based on operational negligence.[11] The RTFA, itself, explains the policy behind this disparate treatment:

> The general assembly declares that it is the policy of the state to conserve, protect, and encourage the development and improvement of its agricultural land for the production of food

---

[11] While the Act also applies to protect industrial operations from nuisance suits, it provides broader immunity to agricultural operations. *See* I.C. § 32-30-6-9(d)(1) (providing a list of changes that, for agricultural operations, do not constitute a significant change in the type of operation).

and other agricultural products. The general assembly finds that when nonagricultural land uses extend into agricultural areas, agricultural operations often become the subject of nuisance suits. As a result, agricultural operations are sometimes forced to cease operations, and many persons may be discouraged from making investments in farm improvements. It is the purpose of this section to reduce the loss to the state of its agricultural resources by limiting the circumstances under which agricultural operations may be deemed to be a nuisance.

I.C. § 32-30-6-9(b). This rationale provides a reasonable basis for treating farmers differently than their non-farming neighbors.[12] *Cf. KS&E Sports*, 72 N.E.3d at 906-07 ("One explanation may be that the legislature … perceived that recent lawsuits against the firearms industry threatened its stability and jeopardized the continued availability of firearms even to law-abiding citizens wishing to exercise their Second Amendment. This rationale would provide a reasonable basis for treating sellers of firearms, which face such litigation threats, differently than sellers of knives, which do not."). With respect to the second prong of the *Collins* test, we conclude that the RTFA's preferential treatment is uniformly and equally available to all agricultural operations and although agricultural operations are treated differently under the RTFA than

---

[12] The Plaintiffs note prior cases in which we have held that the RTFA does not apply between two farmers. *See TDM Farms*, 969 N.E.2d at 110 ("the Act does not apply in this action between two established farming operations"); *Stickdorn v. Zook*, 957 N.E.2d 1014, 1016 n.5 (Ind. Ct. App. 2011) (the RTFA "has no applicability to the manner in which two farmers…conduct their operations). The Plaintiffs claim that the Himsel Plaintiffs could have brought this action if only they had not retired from farming in 2000 and that this fact makes the disparate treatment arbitrary. This is incorrect. The RTFA still applies where one farmer asserts nonagricultural land uses as the basis of his or her nuisance suit against another farmer. *See Parker*, 988 N.E.2d at 323.

industrial operations, the two are not similarly situated and the express intent of the RTFA is to protect agricultural land. The RTFA does not violate Article 1, Section 23.

## Constitutional Challenge to the Agricultural Canon

[42] The Agricultural Canon, enacted in 2014, provides:

> The general assembly declares that it is the policy of the state to conserve, protect, and encourage the development and improvement of agriculture, agricultural businesses, and agricultural land for the production of food, fuel, fiber, and other agricultural products. The Indiana Code shall be construed to protect the rights of farmers to choose among all generally accepted farming and livestock production practices, including the use of ever changing technology.

I.C. § 15-11-2-6(a). The Plaintiffs contend that the Agricultural Canon is unconstitutional for various reasons.

[43] The Agricultural Canon is a rule of statutory construction signaling the legislature's intent to courts called upon to construe ambiguous statutes affecting farmers. In other words, where a statute is clear and unambiguous, the Agricultural Canon will not be applied. *Cf. Crowel v. Marshall Cty. Drainage Bd.*, 971 N.E.2d 638, 646 (Ind. 2012) ("where the statute is clear and unambiguous, we apply it as drafted without resort to the nuanced principles of statutory interpretation"). Further, our primary goal in applying a statute is always to ascertain and give effect to the legislature's intent. *See id.* at 645.

Through the RTFA, the legislature spoke clearly and unambiguously regarding its intent to protect the rights of farmers by limiting the circumstances under which farmers are subject to nuisance actions. This includes protecting agricultural operations that change from one type of agricultural operation to another or that adopt new technology. Given the clear language of the RTFA, this is not a case in which the Agricultural Canon needs to be applied. *See KS&E Sports*, 72 N.E.2d at 898 ("before interpreting a statute, we consider 'whether the Legislature has spoken clearly and unambiguously on the point in question'") (quoting *Basileh v. Alghusain*, 912 N.E.2d 814, 821 (Ind. 2009)). Accordingly, we do not address the various constitutional challenges raised by the Plaintiffs regarding the Agricultural Canon. *See Barlow v. Sipes*, 744 N.E.2d 1, 6 n.1 (Ind. Ct. App. 2001) ("Indiana has long adhered to the doctrine of judicial restraint" where "a constitutional question will not be anticipated in advance of the necessity of deciding the constitutional issue"), *trans. denied*.

## Conclusion

We hold that the Plaintiffs' nuisance and repackaged negligence and trespass claims are barred by the RTFA. Further, the Plaintiffs' various claims that the RTFA is unconstitutional are unavailing, and we do not reach the question of the constitutionality of the Agricultural Canon due to judicial restraint. The trial court properly granted summary judgment in favor of the Defendants on all claims.

Judgment affirmed.

Brown, J. and Tavitas, J., concur.